108    SUPREME COURT OF INDIANA,

Board of Election Commissioners, etc. v. Knight—187 Ind. 108.

---

BOARD, OF ELECTION COMMISSIONERS OF THE CITY OF INDIANAPOLIS v. KNIGHT.

[No. 23,375.    Filed October 26, 1917.    Rehearing denied February 8, 1918.]

1. INJUNCTION.—*Right to Remedy.—Equitable Relief.—Unconstitutionality of Law.*—Although, as a general rule, a court has no jurisdiction to grant equitable relief against the enforcement of a law alone on the grounds of its alleged unconstitutionality, where it is proved that a compliance with the provisions of a law would necessitate a considerable expenditure of public funds, the taxpayer may, through the aid of a court of equity, secure an early interpretation of the law and, on proper occasion, forestall an illegal expense.    p. 111.

2. ELECTIONS.—*Right to Vote.—Woman's Suffrage.*—The right of suffrage is not a natural or an inherent right; it is a political privilege held only by those upon whom it is bestowed either by virtue of express constitutional grant or by authorized legislative provision: hence Art. 2, §2, of the Constitution, which declares that "in all elections not otherwise provided for by this Constitution every male citizen * * * of the age of twenty-one years and upward * * * shall be entitled to vote," being an affirmative grant of privilege, inhibits the legislature from extending, under its broad grant of legislative power contained in Art. 4, §2, the franchise to classes of persons not named.    pp. 113, 114.

Board of Election Commissioners, etc. *v.* Knight—187 Ind. 108.

3.  ELECTIONS. — *Woman's Suffrage.* — *Legislative Power.* — The legislature has no general powers to confer the elective franchise on classes of persons other than those to whom it is given by the Constitution, since the description of those to whom it is given is regarded as excluding all others.   p. 114.

4.  ELECTIONS.—*Right to Vote.*—*Woman's Suffrage.*—*Powers of Legislature.*—In Art. 15, §1, of the Constitution, which declares that all officers whose appointment is not otherwise provided for shall be chosen as prescribed by law, the word "appointment" means the method of selection and authorizes the legislature to determine whether such officers shall be appointed or elected, but does not authorize the legislature to define the electorate that may participate in an election.   p. 116.

5.  ELECTIONS.—*Right to Vote.*—*General and School Elections.*— Since school elections, except as to the office of superintendent of public instruction, are governed by Art. 8, §1, of the Constitution, and not by the provisions for the selection of public officers generally, the power of the legislature to name the electorate for school elections does not extend to general elections. p. 118.

6.  ELECTIONS.—*Right to Vote.*—*Powers of Legislature.*—"*Otherwise Provided For.*"—The manifest purpose of Art. 2, §2, of the Constitution is. to designate the voters entitled to participate in *all* elections "not otherwise provided for by this Constitution," and any effort of the general assembly to establish a different public electorate would necessarily conflict with such section, since an electorate defined by legislative enactment is not "otherwise provided for" by the Constitution, but by the general assembly.   p. 119.

7.  ELECTIONS.—*Right to Vote.*—*Extension.*—*Suffrage.*—*Powers of Legislature.* — *Contemporary Construction.* — Although the legislature in passing various local charter laws prior to the adoption of the present Constitution and the general statute of 1852, assumed that the suffrage qualifications then contained in Art. 2; §2, of the Constitution, and in the similar provision of the Constitution of 1816, were not intended to apply in municipal elections, the adoption of the amendment to such section in 1881 by the people without distinction between municipal and state elections overcame the prior legislative construction, so that such construction by the legislature of its power as to suffrage affords no basis for the contention that the legislature has power to extend the suffrage.  pp. 120, 123.

8.  ELECTIONS. — *Woman's Suffrage.* — *Powers of Legislature.*— The Partial Suffrage Act of 1917, Acts 1917 p. 73, is invalid in so far as it purports to grant to women of the city of Indianapolis the right to participate in the election of a mayor,

a city judge, a city clerk and members of the common council, it being in conflict with Art. 2, §2, of the Constitution.  p. 125.

9.   ELECTIONS. — *Woman's Suffrage.* — *Power of Legislature.* — Where valid and invalid provisions of an enactment are so closely connected that it is apparent that the legislature would not have passed the act except as a whole, the entire act must fail; hence that part of the Partial Suffrage Act, Acts 1917 p. 73, which attempts to confer on women the right to vote for school officers must fail, since the grant of suffrage appears only as an incident in the exercise of an assumed power to extend the right of political franchise, and no part of the act indicates that the legislature was undertaking to exercise its authority in the administration of the public school system. p. 125.

From Marion Superior Court (126a) *John J. Rochford,* Judge.

Suit by William W. Knight against the Board of Election Commissioners of the city of Indianapolis and others.   From a decree for complainant, the defendants appeal.  *Affirmed.*

*Ele Stansbury,* Attorney-General, *Abram Simmons, Catherine W. McCulloch, Emma Eaton White, U. S. Lesh* and *Stuart, Hammond & Stuart,* for appellants.
*Charles E. Cox* and *George H. Batchelor,* for appellee.
*Elias D. Salsbury, amicus curiae.*

SPENCER, C. J.—The general assembly of 1917 passed an act which purports to grant to women of the state the right to vote for certain public officers and at certain elections.   Acts 1917 p. 73.   It also passed an act concerning the registration of voters generally, of which §12, in effect, undertakes to provide for the registration of women as a condition precedent to their exercise of the right of suffrage.   Acts 1917 p. 443.   Subsequently to the passage of these enactments, appellee, as a citizen, voter and taxpayer in the city of Indianapolis, instituted this suit in his own behalf, and in behalf of other voters and taxpayers similarly situated, to restrain

appellants, as members of the boards of registration and election commissioners, from performing certain acts required of them by the above legislation in connection with a municipal election to be held in the city of Indianapolis on November 6, 1917. It is his contention, briefly, that under the Constitution of the state the right of suffrage may not be extended to women, and this appeal is taken from a decree of the Marion Superior Court which sustains in substance the prayer of the complaint.

Preliminary to a consideration of the case on its merits, we are required first to pass on appellant's assertion that the trial court had no jurisdiction to determine the issues sought to be presented, for the reason that the alleged unconstitutionality of a law is not alone sufficient to authorize the granting of equitable relief against its operation. 14 R. C. L. 435, §137. Conceding this general proposition, the rule is equally well established that where, as in this case, it is alleged and proved that a compliance with the provisions of the legislation in question would necessitate a considerable expenditure of public funds, the taxpayer may, through the aid of a court of equity, secure an early interpretation of the law and thus, on proper occasion, forestall an illegal expense. *Bennett* v. *Jackson* (1917), 186 Ind. 533, 116 N. E. 921; *Ellingham* v. *Dye* (1912), 178 Ind. 336, 413, 99 N. E. 1, 99 N. E. 29, 231 U. S. 205, 58 L. Ed. 206, Ann. Cas. 1915C 200.

We pass, then, to a consideration of the principal issues presented and find that, in a broad sense, they may be resolved into an inquiry as to whether the general assembly has the power, under any circumstances, to extend the right of suffrage to persons not included within the provisions of Art. 2, §2, of the Constitution. The inquiry thus suggested, although of vital importance, is purely one of constitutional interpretation, and,

112    SUPREME COURT OF INDIANA,

Board of Election Commissioners, etc. *v.* Knight—187 Ind. 108.

no matter how we may feel or think as to the principle of universal suffrage, the solution of the question before us may not rest on or be influenced by considerations of social policy or political expediency, but must be reached in strict accordance with recognized canons of constitutional construction. In the exact form which it now takes, the issue is largely one of first impression, at least in this state, although, as will be noted later, this court has previously had occasion to announce certain principles which are applicable to the present inquiry and which affect its solution in some degree. The section of the Constitution now under consideration directs that: "In all elections not otherwise provided for by this Constitution, every male citizen of the United States, of the age of twenty-one years and upward, who shall have resided in the state during the six months, and in the township sixty days, and in the ward or precinct thirty days, immediately preceding such election, and every male of foreign birth, of the age of twenty-one years and upwards, who shall have resided in the United States one year, and shall have resided in this state during the six months, and in the township sixty days, and in the ward or precinct thirty days, immediately preceding such election, and shall have declared his intention to become a citizen of the United States, conformably to the laws of the United States on the subject of naturalization, shall be entitled to vote in the township or precinct where he may reside, if he shall have been duly registered according to law." Constitution, Art. 2, §2.

As appellants concede, the above provision is mandatory to the extent that it precludes the legislature from modifying its requirements or from imposing on persons therein designated any additional qualifications which shall be prerequisite to their exercise of the right of suffrage. *State* v. *Shanks* (1912), 178 Ind. 330, 333,

99 N. E. 481; *Morris* v. *Powell* (1890), 125 Ind. 281, 25 N. E. 221, 9 L. R. A. 326; *Quinn* v. *State* (1871), 35 Ind. 485, 9 Am. Rep. 754.

But the contention is made that as neither this nor any other section of the Constitution expressly prohibits the legislature from extending the franchise to classes of persons other than those above enumerated, the exercise of that power is within the purview of Art. 4, §1, which vests the legislative authority of the state in the general assembly. This contention rests on the well-established principle that, except as to limitations imposed by the state or the federal Constitution, or by laws or treaties enacted or adopted pursuant to the provisions of the latter instrument, the legislative powers of the general assembly are practically absolute. *Beauchamp* v. *State* (1842), 6 Blackf. 299, 302. The extent to which this principle is operative finds expression in the rule that if a legislative enactment is properly *within the constitutional grant*, the courts may not declare it invalid on the ground that it is wrong or unjust, or violates the spirit of our institutions, or impairs rights which it is the object of a free government to protect. *Townsend* v. *State* (1896), 147 Ind. 624, 634, 47 N. E. 19, 37 L. R. A. 294, 62 Am. St. 477. At the same time, to adopt a statement made by Chief Justice Marshall in *Fletcher* v. *Pack* (1810), 6 Cranch 87, at ·page 135, (3 L. Ed. 162): "It may well be doubted, whether the nature of society and of government does not prescribe some limits to the legislative power." That doubt has received affirmative recognition by the courts under varying circumstances, but we are not especially concerned at this time with the doctrine of implied limitation on legislative authority, in view of our conclusion that the authority of the general assembly to enact the law in

question is necessarily inhibited by Art. 2, §2, of the Constitution. As was decided in *Gougar* v. *Timberlake* (1896), 148 Ind. 38, 40, 46 N. E. 339, 37 L. R. A. 644, 62 Am. St. 487, the right of suffrage is not a natural or an inherent right, but a political privilege, and it is held only by those on whom it is bestowed, either by virtue of express constitutional grant or through authorized legislative provision. The question is primarily one for the consideration of the people in their capacity as creators of the Constitution, and is never one for the consideration of the legislature except in so far as that instrument clearly sanctions an extension of the elective franchise or permits a regulation of its mode of exercise. *Morris* v. *Powell, supra; Minor* v. *Happersett* (1874), 88 U. S. (21 Wall.) 162, 173, 22 L. Ed. 627; *Coggeshall* v. *City of Des Moines* (1908), 138 Iowa 730, 737, 117 N. W. 309, 128 Am. St. 221, 6 R. C. L. 287, §273.

If, as appellants insist, the general assembly has the power, under its broad grant of legislative authority, to extend the right of suffrage to women of the state, it may likewise extend the same right to male citizens under the age of twenty-one years and to persons of foreign birth who have not declared their intention to become citizens of the United States. The effect of such a construction would be to place Art. 2, §2, purely within the class of restrictive provisions on legislation and practically destroy its character as an affirmative grant of privilege. We need not extend our discussion of this branch of the case, however, as the principle is well established that the legislature has no general power to confer the elective franchise on classes other than those to whom it is given by the Constitution, since its description of those who are entitled thereto is regarded as excluding all others. *State* v. *Patterson* (1913), 181 Ind. 660,

664, 105 N. E. 228; *Gougar* v. *Timberlake, supra,* 48; *McCafferty* v. *Guyer* (1868), 59 Pa. St. 109; *Coffin* v. *Election Commissioners* (1893), 97 Mich. 188, 194, 56 N. W. 567, 21 L. R. A. 662; *Coggeshall* v. *City of Des Moines, supra,* 737; 15 Cyc 298; Cooley, Constitutional Limitations (7th ed.) 99, 245. In this connection, our attention is called to the case of *In re Leach* (1893), 134 Ind. 665, 34 N. E. 641, 21 L. R. A. 701, as authority for the proposition that the maxim *"expressio unius est exclusio alterius"* is not applicable in the construction of a constitutional provision. The decision in that case, however, is to be sustained on the ground that the subject-matter of Art. 7, §21, then under consideration, has reference to an inherent right belonging to every individual rather than on the ground that the principle contained in the maxim is inapplicable as a rule of constitutional interpretation. *Gougar* v. *Timberlake, supra,* 48.

Reference is also made to the fact that from 1851 until its amendment in 1881, the Constitution of Indiana contained a provision (Art. 2, §5) that "No negro or mulatto shall have the right of suffrage;" although during that same period Art. 2, §2, was applicable only to *white* male citizens. It is to be remembered, however, that the present Constitution was adopted during a period in the history of this country in which the public mind was greatly concerned with questions of slavery and of the social and political rights of the negro. Those issues had undoubtedly affected the vote on previous occasions when the matter of undertaking a constitutional revision had been before the people and during the convention of 1850 numerous petitions on the question of negro suffrage, and concerning his political and property rights generally, were presented for consideration. We are warranted, therefore, in considering Art. 2, §5, as an added precaution, indicative of the public

mind on an issue which was then of vital importance, rather than as an intended restriction on the effect of Art. 2, §2, and especially is this conclusion justified by the fact that the negro section, although recognized as unnecessary, was adopted on the principal ground that "it can do no harm." 2 Convention·Debates 1712, 1737. As opposed to this circumstance, we find that Art. 12, §1, which provides that "The militia shall consist of all able-bodied white male persons," etc., has been uniformly construed as excluding colored persons from the service, and on at least three occasions (1885, 1889 and 1913), a proposition for the amendment of the Constitution in this particular has been submitted to the general assembly.

With proper regard, then, for the constitutional history of the state, as well as for the nature of the question at issue, we have determined that the right 4.   of franchise is a political privilege of the highest dignity which can emanate only from the people, either in their sovereign statement of the organic law or through legislative enactment which they have authorized. Our next inquiry is to ascertain whether the Constitution of Indiana authorizes such an enactment. Appellants assert the affirmative of that proposition and rely chiefly on the provision of Art. 15, §1, that "All officers whose appointment is not otherwise provided for in this Constitution, shall be chosen in such manner as now is, or hereafter may be, prescribed by law." The word "appointment," as used in this section, is to be construed as meaning "method of selection" (*McPherson v. Blacker* [1892], 146 U. S. 1, 27, 13 Sup. Ct. 3, 36 L. Ed. 869), and is thus broad enough to allow the legislature to determine whether such officers shall be *appointed,* in the strict sense of the term, or *elected* by popular vote. We cannot agree, however, that, in the latter alternative, the legislature has the further author-

ity to define the electorate which may participate in such election.   The right to determine the "manner" in which' public officers are to be chosen has reference only to, the method or mode of selection and does not include the power to determine the qualifications of the legal voters.   *Livesley* v. *Litchfield* (1905), 47 Ore. 248, 253, 83 Pac. 142, 114 Am. St. 920; *Coffin* v. *Election Commissioners*, *supra; People, ex rel.* v. *English* (1892), 139 Ill. 622, 629, 29 N. E. 678, 15 L. R. A. 131; *People, ex rel.* v. *Guden* (1902), (Sup.) 75 N. Y. Supp. 347, 349.

As denying force to the proposition just stated, we are referred to the decision in *Scown* v. *Czarnecki* (1914), 264 Ill. 305, 106 N. E. 276, L. R. A. 1915B 247, Ann. Cas. 1915A 772, and to certain other cases which relate principally to the election of school officials.   The suffrage enactment now under consideration is based substantially on the Illinois Woman's Suffrage Law of 1913, which the Supreme Court of that state, in *Scown* v. *Czarnecki, supra,* held to be constitutional on the theory, as stated at page 312 of the opinion, that "if an office is not of constitutional origin it is competent for the legislature to declare the manner of filling it, how, when and by whom the incumbent shall be elected or appointed, and to change, from time to time, the mode of election or appointment."   This decision is based expressly on the cases of *Plummer* v. *Yost* (1893), 144 Ill. 68, 33 N. E. 191, 19 L. R. A. 110, and *People, ex rel.* v. *English, supra,* of which the latter case holds, in part, that as the county superintendent of schools is mentioned in the Illinois Constitution, the legislature has *no authority* to extend to persons not possessed of the constitutional qualifications the right to vote for that officer, even though the Constitution further provides that his "time and manner of election   *   *   *   shall be prescribed by law."   The court says, at page 630 of the

118    SUPREME COURT OF INDIANA,

Board of Election Commissioners, etc. *v.* Knight—187 Ind. 108.

opinion, that the "word 'manner' * * * indicates merely that the legislature may provide by law the usual, ordinary or necessary details required for the holding of the election." No sound basis is perceived for distinguishing between such a use of the word in the Illinois Constitution and in that of Indiana. It is true that in the one case the Constitution first names the officer and then directs that he shall be *elected* in such "manner" as may be prescribed by law, while in the other the general assembly is authorized to name the officer itself and then to provide for his *election* or *appointment* in such "manner" as may be prescribed by law, but when, under the latter authority, an office has been created and provision made for the *election* of the incumbent, the only remaining step is to determine the "manner" of his election, and the rule as above expressed in the English case is at once applicable. The bare fact, standing alone, that one officer is named in the Constitution and the other is not, affords only an arbitrary ground for distinction as to who may participate in their election. The dissenting opinion of Mr. Justice Cooke, in *Scown* v. *Czarnecki, supra,* considers the Yost and English cases at length and effectively discloses the unsoundness of the majority opinion of his associates, which, in its analysis, rests on an erroneous application of the doctrine of *stare decisis.*

Concerning the school cases, it is enough to note that, except as to the selection of a state superintendent of public instruction, the entire matter of developing the public school system and of providing for its administration rests with the general assembly under Art. 8, §1, of our Constitution, and is in no sense governed by any provision made for the selection of public officers generally. That distinction has long been recognized by the courts of this and other states, although not always based on the same ground. *Kelso*

NOVEMBER TERM, 1917. 119

Board of Election Commissioners, etc. *v.* Knight—187 Ind. 108.

v. *Cook* (1915), 184 Ind. 173, 184, 110 N. E. 987; *State, ex rel.* v. *Haworth* (1890), 122 Ind. 462, 466, 23 N. E. 946, 7 L. R. A. 240; *Belles* v. *Burr* (1889), 76 Mich. 1, 11, 43 N. W. 24; *Plummer* v. *Yost, supra,* 75; *Wheeler* v. *Brady* (1875), 15 Kan. 26; *State* v. *Cones* (1884), 15 Neb. 444, 447, 19 N. W. 682.

To return to the question at issue, it is clear that any effort on the part of the general assembly to establish a public electorate which would differ 6. from that defined in Art. 2, §2, of the Constitution must necessarily be in conflict with the manifest purpose of that section to designate the voters entitled to participate in *all* elections "not otherwise provided for by this Constitution." Certain elections in which the members of one or both houses of the general assembly constitute the electorate are "otherwise provided for" in the Constitution and this fact is expressly recognized in Art. 2, §13, which requires that "All elections by the people shall be by ballot; and all elections by the General Assembly, or by either branch thereof, shall be *viva voce*." An electorate defined by legislative enactment is not "otherwise provided for by this Constitution," but by the general assembly, and the passage of such an enactment can be of no force in view of the express constitutional declaration that, except as otherwise provided *in that instrument,* every male citizen who possesses certain qualifications shall be entitled to vote in *all* elections. As was decided in *People, ex rel.* v. *Canaday* (1875), 73 N. C. 198, 221, 21 Am. Rep. 465, whenever a Constitution designates a certain class of persons as electors or confers on them the right of suffrage, it means that, in the absence of other restrictive provisions contained therein, they shall be entitled "to vote generally whenever the polls are opened and elections held for anything connected with the general government, or the state or local governments." When prop-

erly construed, then, Art. 15, §1, vests in the general assembly the right to determine in what manner offices of its own creation shall be filled, but whenever, in the exercise of that power, provision is made for the selection of the incumbents by popular vote, the qualifications prescribed in Art. 2, §2, control in fixing the electorate.

It is earnestly insisted, however, that for a long period of time immediately preceding and subsequent to the adoption of our present Constitution, the general

7. assembly regularly assumed to designate the qualifications for legal voters in municipal elections, and that this interpretation by the legislature of its own power is now of controlling importance. We may concede that a uniform and long-continued exposition of a constitutional provision, though not conclusive, is generally entitled to great weight, and should not be departed from unless it is manifestly erroneous or has received disapproval in a subsequent expression of the sovereign will. 6 R. C. L. 63, §60. With this principle in mind, we proceed to a consideration of the constitutional and legislative history of the state as it concerns the question of suffrage in municipal elections. Under the Constitution of 1816, the right of suffrage, "in all elections not otherwise provided for" in that instrument, was granted to every white male citizen of the United States, of the age of twenty-one years and upwards, who had resided in the state one year immediately preceding such election, and he was entitled to vote in the county of his residence. Constitution 1816, Art. 6, §1. Certain elections were "otherwise provided for" in that Constitution, as in the present, and this was particularly true of the military elections in which the suffrage qualifications differed materially from those fixed in the general grant. Constitution 1816, Art. 7, §§3, 4, 5. This fact has a bearing on the questions now in issue as indicating that the clause "otherwise pro-

vided for by this Constitution," which was readopted without change in 1851, has reference only to the *constitutional* definition of a special electorate which should participate in certain elections. The Constitution of 1816 also provided that "town and township officers shall be appointed in such manner as shall be directed by law" (*People, ex rel.* v. *English, supra*), and authorized the general assembly to determine in what "manner" offices of its own creation should be filled. Constitution 1816, Art. 4, §8, and Art. 11, §15. No provision was made, however, for the creation of towns and cities generally and it soon became the practice, whenever it was desired to establish a municipal corporation, to petition the legislature for the passage of a special law which should contain the charter grant. These laws regularly assumed to fix the qualifications for municipal suffrage and were not uniform in that particular, as local necessities usually served as the guide in determining such qualifications. During the formative period of that policy, at least, communication between the various towns and cities of the state was difficult and limited, and there existed, in some degree, a condition of social and political isolation which tended to prevent a recognition of the fact that the municipal unit is a governmental agency of the state as well as an organization for the control of local affairs. In view of this condition, it may be argued with reason that, in the first instance, the practice of providing local qualifications for municipal suffrage developed out of the existing relation between the town or city and the state, rather than from a belief on the part of the general assembly that it had full authority to provide the electorate for the choice of all officers not mentioned in the Constitution. It must be conceded, however, that the practice continued until the adoption of the present Constitution in 1851, and the assertion is now made that in framing

that instrument -without making different provision for determining the municipal electorate, the people of the state impliedly accepted the interpretation by the legislature of its own authority in that particular, but in view of later developments this circumstance becomes of no importance.

Article 2, §2, of the present Constitution, as originally adopted, conferred the general right of suffrage on "every white male citizen of the United States, of the age of twenty-one years and upwards, who shall have resided in the State during the six months" immediately preceding an election, and on white males of foreign birth, possessed of the same qualifications, who had resided in the United States for one year and had declared their intention to become citizens under the naturalization laws. In 1852 the general assembly passed an act which provided, in part, that "in all municipal elections in this State, no other or different qualifications shall be required of voters, than that which shall entitle them to vote at any township, county or State election, *except that their residence shall be in the ward of the city or town where such election shall be holden.*" Acts 1852 p. 124. It is apparent, from the portion of the law which we have italicized, that the general assembly still assumed to fix the qualifications for municipal suffrage, but the clause in question becomes important later in establishing a sovereign disapproval of that practice. This court knows, as a matter of public history (*Smith* v. *Pedigo* [1896], 145 Ind. 361, 418, 33 N. E. 777, 44 N. E. 363, 19 L. R. A. 433, 32 L. R. A. 838), that one of the principal reasons for the amendment of the Constitution in 1881 is to be found in the extent to which fraudulent and illegal voting had, for some years, marked the holding of political elections in city and state alike. (Governor's Message, January 4, 1877). Various proposals were made to amend the

NOVEMBER TERM, 1917.    123

Board of Election Commissioners, etc. *v.* Knight—187 Ind. 108.

residential qualifications as set forth in the Constitution and in 1877 a resolution was introduced in the senate which provided for residence in the township or precinct for sixty days immediately preceding an election. Prior to its passage, however, that resolution was amended, in part, *by adding an alternative provision for residence in the ward,* thus adopting the very requirement which was exacted of voters in municipal elections by the general assembly of 1852. The ward exists only as a political subdivision of the city or town (§§8641, 8984 Burns 1914, Acts 1905 p. 219, Standard Dictionary) and there can be do doubt that when the people of this state, in 1881, amended Art. 2, §2, of their Constitution in accordance with the resolution of 1877, they intended that its requirements should apply in determining the qualifications of voters at all state, county, township and municipal elections of a political nature. Even though it be admitted that prior to the amendment of 1881, municipal elections were of a class *"otherwise provided for by this Constitution,"* the effect of that amendment was to bring such elections within the class *"not* otherwise provided for" by that instrument and to make the constitutional qualifications applicable in determining the electorate. The evil which the amendment sought to check was as pronounced in city elections as in those for the choice of state officers and it is inconceivable that the people should have sought to remedy the condition in one instance and not in the other, or that they should have adopted the legislative provision of 1852 concerning municipal elections, unless it was their intention to make the constitutional requirements applicable in elections of that class.

If we concede, then, that in passing the various local charter laws prior to the adoption of our present Constitution and in enacting the general statute of

7.    1852, the legislature assumed that the suffrage

124 SUPREME COURT OF INDIANA,

Board of Election Commissioners, etc. *v.* Knight—187 Ind. 108.

qualifications then contained in Art. 2, §2, and in the similar provision of the Constitution of 1816, were not intended to apply in municipal elections, it is equally evident that in adopting the amendment of 1881 the people plainly announced that this assumption had been erroneous and should not continue, and from that time, until in the present instance, the general assembly has made no effort to prescribe or change the qualifications for municipal suffrage. It is true that §230 of the Cities and Towns Act of 1905 provides that "In all municipal elections, no other qualifications shall be required of any voter than such as are made necessary in general elections under the constitution and laws of the state" (Acts 1905 p. 219, §8884 Burns 1914), but that provision is no more indicative of a legislative belief that other requirements might be exacted than is the fact that in 1881 the general assembly passed a general-election law prescribing for all voters certain qualifications which are identical with those set forth in the Constitution. §6876 Burns 1914, Acts 1881 (s.s.) 482. Furthermore, the "laws of the State" which are referred to in the act of 1905, *supra*, consist (1) of a restatement, in substance, of the constitutional provisions on the question of suffrage and (2) of a statute concerning disfranchisement which was passed pursuant to express constitutional direction. §§6876-6879 Burns 1914.

The principle of legislative interpretation, in order to be properly applicable to the issues in this case, must have been based on acts passed since 1881 which would indicate a belief on the part of the general assembly that the suffrage provisions of the Constitution, as amended in that year, were not intended to apply in city elections. The basis for such a contention is lacking and our determination of the present inquiry must rest, therefore, on the conclusions heretofore reached, (1) that Art. 2, §2, of the Constitution, in itself, defines the electorate which

shall participate in every state, county, township and local election of political officers, and (2) that the general assembly has no authority to extend the right of franchise to persons not included within that definition.

Applying these general principles to the facts in issue, we must sustain the decision of the trial court in holding that the Partial Suffrage Act of 1917 is invalid in so far as it purports to grant to women of the city of Indianapolis the right to participate in the election of a mayor, a city judge, a city clerk, and the members of the common council. The remaining inquiry is to determine their right to participate in the election of members of the board of school commissioners.. The Suffrage Act undertakes, in part, to confer on women the right to vote "for all school officers elected by the people," but that grant appears only as an incident in what is plainly an exercise of an assumed power to extend the right of political franchise. No suggestion is made, either in the title of the act or in its provisions as a whole, which would indicate that the general assembly was there undertaking to exercise its authority over the administration of the public school system, and, under such circumstances, the case is governed by the rule that where valid and invalid provisions of an enactment are so connected one with the other that it is apparent that the legislature would not have passed the act, except as a whole, the entire statute must fall. *State, ex rel.* v. *Fox* (1901), 158 Ind. 126, 130, 63 N. E. 19, 56 L. R. A. 893; *State, ex rel.* v. *Blend* (1890), 121 Ind. 514, 521, 23 N. E. 511, 16 Am. St. 411; *Griffin* v. *State, ex rel.* (1889), 119 Ind. 520, 22 N. E. 7; 6 R. C. L. 123, §122.

This conclusion requires a full affirmance of the judgment of the Marion Superior Court and it is so ordered.

Myers, J., concurs; Lairy, J., concurs in the conclusion reached; Harvey, J., dissents.

## Concurring Opinion.

Lairy, J.—This appeal calls in question the validity of an act of the general assembly of this state approved February 28, 1917, which purports to extend to women possessing certain qualifications as to age, citizenship and residence, the right to vote at certain elections and for certain officers therein specified, including the right to vote at elections to be held in cities and towns for the election of municipal officers. The validity of the act is challenged, in so far as it purports to grant to women the right to vote for municipal officers of cities and towns, on the ground that it is in conflict with Art. 2, §2, of our state Constitution.

The decision of the question thus presented involves both a construction and an application of this section of the Constitution. Appellee asserts that the qualifications of voters as fixed therein should be held to be both inclusive and exclusive—including all persons possessing the qualifications named and excluding all others. It is asserted that it restricts the legislature from imposing additional qualifications so as to deny the right of franchise to any one possessing the qualifications named in the section, and that it also restricts the legislature from extending the right of franchise so as to include persons not possessing all of the qualifications specified therein. Appellee also asserts that the qualifications of voters as fixed by this section apply to all elections by the people including the elections of municipal officers in cities and towns.

On the other hand, appellant admits that the section in question should be construed as guaranteeing the right of suffrage to those possessing the qualifications designated therein and inhibiting the legislature from excluding any such persons from the exercise of that right, and they find no fault with the decisions of this

court which have so construed it. *Morris* v. *Powell* (1890), 125 Ind. 281, 25 N. E. 221, 9 L. R. A. 326; *Brewer* v. *McCleland* (1895), 144 Ind. 423, 32 N. E. 299, 17 L. R. A. 845; *Quinn* v. *State* (1871), 35 Ind. 485, 9 Am. Rep. 754. They assert, however, that the section does not by its terms expressly exclude all persons not possessing the prescribed qualifications, and that it should not be construed as inhibiting the legislature from extending the privilege to others who lack some of the qualifications prescribed in the Constitution. They further assert that the qualifications of electors as stated therein do not apply to voters at municipal elections in cities and towns.

In regard to the construction to be placed on Art. 2, §2, of the Constitution, I concur in the opinion of Spencer, C. J., in so far as it sustains the position of appellee, as hereinbefore stated in this opinion. "In construing a constitution, resort may be had to the well recognized rule of construction contained in the maxim, *expressio unius est exclusio ulterius.*" 6 R. C. L. .49; *Page* v. *Allen* (1868), 58 Pa. St. 338, 98 Am. Dec. 272; *Ex Parte Vallandigham* (1863), 1 Wall. 243, 17 L. Ed. 589.

In the case last cited the Supreme Court of the United States placed a construction on that part of Art. 3, §2, of the federal Constitution which confers original jurisdiction on that court and which reads as follows: "In all cases affecting ambassadors, other public ministers, and consuls, and those in which a State shall be a party, the Supreme Court shall have original jurisdiction." It was held that the affirmative words, declaring in what cases the Supreme Court should have jurisdiction, must be construed negatively as to all other cases. Applying the same principle of construction here, it must be held that the provision of the section under consideration to the effect that citizens of the United States

possessing the qualifications designated in the section shall be entitled to vote at all elections not otherwise provided for, must be construed negatively as to all persons not possessing those qualifications. So construed, this section inhibits the legislature from granting to women, or to any other class of citizens not possessing the qualifications stated therein, the right to vote at any election to which the section applies.

Appellants take the position that, as the Constitution does not in express words inhibit the legislature from extending the right of suffrage to persons not possessing the qualifications prescribed by Art. 2, §2, the legislature may extend the privilege in the exercise of the general legislative power granted to it by the Constitution. They cite *Beauchamp* v. *State* (1842), 6 Blackf. 299. Speaking of the general grant of legislative power by the Constitution, the court said: "This is not a grant of special, limited, and enumerated powers, implying a negative of all others, as is the case with the Constitution of the United States. The legislative authority of this state is the right to exercise supreme and sovereign power, subject to no restrictions except those imposed by our own Constitution, by the federal Constitution, and by the laws and treaties made under it." The writer is in full accord with the doctrine as announced in the foregoing quotation. State constitutions are to be regarded as a restraint of legislative power rather than a grant, and a statute must be upheld unless it conflicts with some constitutional provision which restrains or restricts the legislature from enacting it. *State* v. *Patterson* (1913), 181 Ind. 660, 105 N. E. 228; *McComas* v. *Krug* (1882), 81 Ind. 327, 42 Am. Rep. 135.

It is not necessary, however, that such restriction should be stated in the Constitution in express words. It is sufficient if the restriction arises by necessary im-

plication from a proper construction of the instrument or of any of its provisions. Article 2, §2, of the Constitution when construed as heretofore indicated, has the effect of restraining the legislature from extending to women the right to vote at municipal elections in cities and towns, unless appellants are correct in saying that the qualifications of voters prescribed in this section do not apply to voters at municipal elections, for the reason that such qualifications are applicable under the wording of the section only to elections not otherwise provided for in the Constitution, whereas it is claimed that municipal elections do not belong to this class but do belong to a class otherwise provided for in the Constitution, at which class of elections no special qualifications for voters are provided. As to such elections it is claimed that the legislature has the power to prescribe qualifications for voters regardless of those qualifications contained in Art. 2, §2, of the Constitution.

In support of the proposition just stated the attention of the court is called to the fact that, during the period of time that the state government was conducted under the Constitution of 1816 the legislature assumed to designate the qualifications of legal voters in towns and that the qualifications thus prescribed differed from the qualifications of voters as designated by Art. 6, §1, of our first Constitution. Within that period numerous towns were incorporated by special acts of the legislature, which acts fixed the qualifications of voters in such towns differing in most instances from the qualifications of voters as fixed in the then existing constitution. Acts 1820 p. 42, Town of Charlestown; Acts 1828 p. 30, §2, Town of Corydon; Local Laws 1836 p. 32, §2, Town of Vincennes.

Section 1, Art. 6, of the Constitution of 1816 was as follows: "In all elections, not otherwise provided for by this constitution, every white male citizen of the United States, of the age of twenty-one years and upwards, who has resided in the state one year immediately preceding such election, shall be entitled to vote in the county where he resides; except such as shall be enlisted in the army of the United States or their allies." It will be observed that the only qualifications required of a person in order to fit him to exercise the right of franchise were that he should be a male person, that he should be white, that he should be a citizen of the United States, and that he should be of the age of twenty-one years or upward, and that the only condition prerequisite to entitle such a person to vote in the county of his residence was that he must have resided in the state for one year immediately preceding the election. No condition was imposed by the section in respect to residence for any definite time within any territory of less extent than the state, and the territory within which the right to vote might be exercised was not limited to any extent less than the county in which the person offering to vote resided. In this connection a distinction is recognized by the writer between qualifications which refer to qualities inherent in the individuality of the voter regarded as fitting him to the exercise of such right, and conditions prerequisite to the exercise of the right to vote in a particular place or locality; but as no such distinction has been observed by courts generally in this respect and as residence has been universally regarded as a qualification, it will be so treated in the discussion which follows.

It seems clear that qualifications thus fixed by the Constitution could not, with reason, be held to apply to the voters of towns organized within any county of the state. If no other qualifications for voters in towns

could have been provided by the legislature, every white male citizen of the United States of the age of twenty-one years and upward residing within the county could have qualified as a voter at every election of every town within the county, if he had resided in the state for one year immediately preceding such election.   It thus appearing that the provisions of Art. 6, §1, with reference to the qualifications of voters could not, with consistency, be held to apply to town elections, the legislature prescribed a residence within the limits of the town for some fixed period as a prerequisite of the right to vote at such an election and also fixed such other qualifications as it deemed proper and expedient.   The conclusion necessarily follows that the section of the 1816 Constitution under consideration was not intended as a limitation of the power of the legislature to fix the qualifications of voters at town elections held for municipal purposes.   It could not, with reason, be held to have such an effect and it was never given such an effect by any construction placed upon it either by the legislature or the courts.

By Art. 6, §1, of the Constitution of 1816, two classes of elections were recognized:   First, elections not otherwise provided for in the Constitution; and, second, elections which were otherwise provided for in the Constitution.   The qualifications of voters at all elections falling within the first class were fixed by this section of the Constitution, but the qualifications of voters at elections falling within the second class were not so specified and were therefore left to the legislature.   In assuming to fix the qualifications of voters in town elections the legislature placed a construction on the Constitution to the effect that such elections were otherwise provided for by the Constitution and therefore fell within the second class mentioned.   In searching the Constitution for some provision upon which such

a construction could be based, we find Art. 11, §15, reading as follows: "All town and township officers shall be appointed in such manner as is provided by law," and at the end of §8, Art. 4, the former part of which provides that certain officers shall be appointed by the Governor, we find this provision: "And all offices which may be created by the general assembly shall be filled in such manner as may be directed by law." If the election of officers for towns were otherwise provided for in the Constitution of 1816 the authority for such a claim must be found in one or the other or in both of the provisions quoted, and it must be assumed that the legislature, in providing for the election of such officers and in fixing the qualifications of voters at such elections, acted under the authority therein contained with the acquiescence of the people during the entire period in which the state government was administered under the Constitution of 1816.

In 1851 the people of the state adopted a new Constitution. Article 2, §2, of this Constitution fixing the qualifications of voters was as follows: "In all elections not otherwise provided for in this Constitution every white male citizen of the United States of the age of twenty-one years and upwards, who shall have resided in the state during the six months immediately preceding such election; and every white male of foreign birth of the age of twenty-one years and upwards who shall have resided in the United States one year, and shall have resided in this state during the six months immediately preceding such election, and shall have declared his intention to become a citizen of the United States, conformably to the laws on the subject of naturalization, shall be entitled to vote in the township or precinct where he may reside."

The qualifications of voters as fixed by the Constitution of 1816 were changed by this section of the new

Constitution. By the old Constitution only white male citizens of the United States were permitted to exercise the franchise, but by this section the right of franchise was extended so as to include white males of foreign birth who had declared their intention to become citizens of the United States in conformity with the laws on the subject of naturalization and who possessed the other qualifications fixed by this section. The requirement as to residence within the state was shortened from one year as provided by the first Constitution to six months as provided by this section, but no definite period of residence within any municipal subdivision of the state was required as a prerequisite to the right to vote. Under the Constitution of 1816, a qualified voter might exercise his right of franchise anywhere within the county of his residence, but by this section his right to vote was limited to the township or precinct in which he resided.

This section, like the section of the Constitution of 1816 on the same subject, recognized two classes of elections: First, elections not otherwise provided for in the Constitution, the voters at which were required to possess the qualifications specified therein; and, second, elections otherwise provided for in the Constitution. The voters at elections of the second class were not required to possess the qualifications fixed by this section for the reason that those qualifications were expressly limited to voters at "all elections not otherwise provided for in this constitution." Section 15 of Art. 11, before quoted, providing for the appointment of officers of townships and towns, and the part of §8, Art. 4, also quoted, with reference to the manner in which offices created by the legislature should be filled, were omitted from the new Constitution, and the following provisions in respect to the selection of officers were embodied therein: Such other county and township of-

ficers as may be necessary shall be elected or appointed in such manner as may be prescribed by law. Art. 6, §3. All officers, whose appointment is not otherwise provided for in this Constitution, shall be chosen in such manner as now is or hereafter may be prescribed by law. Art. 15, §1.

As before stated, the provisions of Art. 2, §2, *supra*, permitted an elector possessing the qualifications therein designated to vote anywhere within the township or precinct in which he resided. If elections held in towns for municipal purposes belonged to the first class of elections recognized by this section as hereinbefore designated, then such an elector living any place in a township or precinct which contained an incorporated town would be qualified to vote at all elections held within such town for municipal purposes, even though he did not live in such town, but lived in a remote part of the township.

After the adoption of the Constitution of 1851, the legislature by an act approved March 10, 1852, provided that: "In all municipal elections in this State, no other or different qualifications shall be required of voters, than that which shall entitle them to vote at any township, county or state election, except that their residence shall be in the ward of the city or town where such election shall be holden." Acts 1852 p. 124. The effect of this act was to produce uniformity in the qualifications of voters in all cities and towns. The qualifications adopted for the voters of such towns were the same as those prescribed by Art. 2, §2, of the Constitution except the requirement of residence in the ward of the town in which he offered to vote. The exception was intended to exclude from participation in municipal elections all qualified voters residing outside of the corporate limits of the city or town but within the township or precinct in which it was located, who,

in the absence of such an exception would have been entitled to vote at any election in the township or precinct.

It thus appears that in fixing the qualifications of voters in cities and towns the legislature imposed a residence qualification not required to qualify a voter under the provisions of Art. 2, §2, of the Constitution of 1851. By so doing the legislature placed a construction on the section of the new Constitution hereinbefore set out to the effect that city and town elections fell within the class of elections otherwise provided for in the Constitution, as before indicated in this opinion and that the qualifications for voters as fixed in Art. 2, §2, did not apply to voters at such elections. Upon this theory the legislature provided for the election of officers of such municipalities under the provisions of Art. 15, §1, of that Constitution by providing an electorate for such officers and fixing the qualifications of the voters. The constitutionality of this statute was never brought before the highest court of this state for determination, thus indicating an acquiescence on the part of the people generally in the construction thus placed on the Constitution by the legislature.

No further change was made in our Constitution on the subject of the qualifications of voters until the adoption in 1881 of amended §2 of Art. 2, which was first proposed by the legislature of 1877. From the time of the adoption of the Constitution of 1851 to the time this amendment was proposed, the people of the state had manifested a desire as expressed through their legislatures of conforming the qualification of voters in city and town elections as nearly as practical to the qualifications prescribed for voters in Art. 2, §2, of that instrument. As a result, the qualifications of voters at municipal elections in cities and towns were identical with the qualifications prescribed by that section except that

voters at such municipal elections were required to live in the ward in which they offered to vote. It required only a slight change of the qualifications of voters as fixed by Art. 2, §2, of the Constitution of 1851 to make them identical with the qualifications of voters at city and town elections. It required only that the section in question be amended by adding the requirement that the voter should reside in the ward in which he offered to vote. The addition of this requirement to the qualifications of voters as then fixed by the Constitution would make them conform in all respects to the wishes of the people in regard to the qualifications of voters at municipal elections in cities and towns as expressed by their representatives in the general assembly by legislative enactments on the subject. In order to accomplish this result, the legislature which proposed the amendment under consideration embodied therein a requirement that the voter should reside in the ward or precinct for thirty days immediately preceding the election. The ward exists only as a political subdivision of a city or town, and the word could have been employed in this amendment for no other purpose than to make the qualifications of voters, as specified therein, applicable in all respects to municipal elections, and to bring those elections within the class to which such qualifications apply. There can be no doubt that other reasons existed for the amendment of this section, one of which was the prevention of illegal and fraudulent voting, but this would have been as effectually restrained without requiring a residence in a ward. (Governor's Message, January 4, 1877.) The resolution proposing the amendment as introduced in the senate required only a residence in the township or precinct. If it had been adopted and approved in this form it would have had the effect of requiring voters to reside in a territory of small limits for a fixed period immediately preceding an

election and in this way it would have aided in the detection and prevention of illegal and fraudulent voting in accordance with the recommendations of the governor as contained in his message, but it would not have disqualified a voter residing outside the corporate limits of a city or town from voting at a municipal election of a city or town located wholly or partially within the precinct of his residence. This result could be accomplished only by a requirement that the voter should live in a ward of the town, and to accomplish this end the resolution was amended so as to require a residence in the ward. By the adoption of this amendment, the people expressed their will to the effect that the qualifications of voters as fixed therein should apply to elections held in cities and towns for municipal purposes, thus crystallizing and perpetuating their will in this respect in the supreme law of the state and thereby placing it beyond the reach of the legislature until such time as the sovereign people may see fit to express a different will by adopting a new Constitution or by amending the one now in force.

In reaching this conclusion, consideration has been given to the constitutional and legislative history of the state on the subject. In the light of such history leading up to the proposal and adoption of the amendment under consideration, and in view of the conditions existing at the time and the circumstances attendant upon the proposal and adoption of that amendment, I am convinced beyond a reasonable doubt that one of its purposes was to make the qualifications of voters as fixed therein apply to municipal elections. To my mind, an express declaration therein to the effect that the qualifications of voters as fixed in the amendment should apply to voters at municipal elections in cities and towns could not have been more certainly indicative of the will of the people in this regard than was the additional

requirement of residence in the ward inserted with the unequivocal purpose and intention of making the qualifications so prescribed apply to voters at such municipal elections.

Having no reasonable doubt that the amendment of §2 of Art. 2 of the Constitution has the effect heretofore indicated, I am prepared to hold that, in so far as the act of the legislature here under consideration attempts to confer on women the right to vote for municipal officers in cities and towns, the same is in conflict with that section of the Constitution as amended in 1881. I therefore concur in the conclusion reached in the opinion by Spencer, C. J., for the reasons herein stated.

### DISSENTING OPINION.

HARVEY, J.—I agree with my associate judges that the trial court had jurisdiction of this cause. I cannot agree, however, that the general assembly lacked power to pass the act of 1917, granting to women the right of suffrage at town and city elections.

During the sixty-five years, between the adoption, in 1816, of the first Indiana Constitution, and 1881, the general assembly, by grant of the people, expressed in the Constitution of 1816 and that of 1851, had and exercised the power to prescribe who should be entitled to vote at municipal elections—at elections in towns during the early years of the state's existence—there being then no cities, and in towns and cities later. The general assembly still has that power, unless the amendment of the Constitution in 1881 withdrew that power. The foregoing statements, in my opinion, are not contrary to a fair inference to be drawn from the prevailing opinion in this case, and are in accord on this proposition with the concurring opinion.

The amendment of 1881 did not, in my opinion, de-

Board of Election Commissioners, etc. *v.* Knight—187 Ind. 108.

prive the general assembly of that power, and, therefore, the general assembly in 1917, had power, granted by the people through the Constitution, to pass the act in question. Whether the general assembly should or should not prescribe any such qualifications for voters at town and city elections is for the exclusive determination of the assembly, if authority so to do exists in the assembly. Thus the question for determination is not whether it is right, or good policy, for women to vote at town and city elections, but is simply whether the legislature has power to provide that women may vote.

In solving this law question, we find that the people, in the Constitution of 1816, created two classes of elections; and it is sufficient, and directly to the point in this case, to describe these two classes as follows: First, elections at which those may vote who possess qualifications to be prescribed *by the legislature,* under power granted to the legislature by the people in the Constitution. Second, elections at which those may vote who possess qualifications prescribed *in the Constitution* itself.

For convenience and brevity and for the purposes only of this case, the first class will hereinafter be called "town" or "town and city" elections; and the second class will be termed state elections; the latter are sometimes also designated as "general elections." These designations are not to be taken as exactly correct, as each class includes other elections, but these designations serve well the purpose of distinction herein to be made between the two classes.

To the first class belong town and city elections. By the Constitution, town and city elections are thus divorced from the qualifications prescribed in the Constitution for voters at state elections; and divorced from all rules and decisions which have a bearing on the question whether the general assembly can add to or take

from the qualifications named in the Constitution for state elections.

The people having specifically provided in the Constitution how certain officers shall be selected, including in this class officers of towns and townships, the people further say in the Constitution that at all elections *"not"* thus *"otherwise provided for,"* the voters shall be males, twenty-one years of age, who have resided within certain geographical areas for a designated time.

The language of the Constitution of 1816 on this subject was, Art. 11, §15: "All town and township officers shall be appointed in such manner as shall be directed by law." Art. 6, §1: "In all elections, not otherwise provided for by this Constitution, every white male citizen of the United States, of the age of twenty-one years and upwards, who has resided in this state one year immediately preceding such election, shall be entitled to vote in the county where he resides." It is thus made clear by the Constitution itself that the selection of town officers is "otherwise provided" for in the Constitution, because the Constitution says that they "shall be appointed in such manner as directed by law," which, of course, means, as shall be directed by the legislature; and inasmuch as the selection of town officers is thus "otherwise provided for," elections of town officers are not in the class of elections not otherwise provided for. An expression of this thought in another form may aid: The Constitution provides that at all elections voters shall have the certain, named and described qualifications above mentioned. The Constitution also, however, expressly excepts from the elections above named—that is, from "all" elections—certain elections "otherwise provided for," at which voters need not have the certain, named qualifications applying to "all" other elections, and thus the Constitution is to be construed as if it read,—except as otherwise

herein provided for, electors shall possess the certain, named and described qualifications; and as town elections are otherwise provided for, they are within the exception, and to them the designated qualifications do not apply.

Obvious reasons existed then, and exist now, for each and every provision in the Constitution as to the agency for the selection of officers, and a very obvious and special reason existed for the retention by the people of the right to provide by legislation for self-government of towns. A reason for not fixing in the Constitution the qualifications of voters at town and city elections is that an effort to amend the Constitution consumes much time, and is fraught with many difficulties; whereas the people can, through the legislature, more easily and readily express their desires, and more frequently change that which is found inapt or undesirable; and by delegating to the legislature authority to say who shall vote at town elections, the people recognized and asserted, to that extent, a principle of local self-government, which has existed and been fostered by the people since long prior to the organization of the state. They retained near at hand this means of changing the electorate, as experience and development might dictate.

Speaking generally of the subject of local self-government, Judge Elliott, whose opinions have always commanded the highest respect and consideration, says in *State, ex rel.* v. *Denny, Mayor* (1889), 118 Ind. 382, 401, 21 N. E. 252, 4 L. R. A. 79: "It needed no constitutional declaration to invest the people with this power, but it does require a constitutional provision to take it from them in whole or *in part*. This inherent power includes the right of the people to choose their rulers. An essential part of this inherent power, as it has been asserted and exercised for many years, is the right of the electors of a locality to choose their own immediate

142    SUPREME COURT OF INDIANA,

Board of Election Commissioners, etc. *v.* Knight—187 Ind. 108.

officers. In my judgment our Constitution does not take away this right, but leaves it in the people, undiminished and undisturbed. There it has resided for ages, and there it is to reside until the people shall, in due course, change their organic law." Judge Elliott, in the decision above cited, was distinguishing between appointment of city officers by the general assembly and the election thereof by the people; but this distinction serves to emphasize the fact that the people have jealously guarded this right, and that such was their purpose in retaining within easy control the matter of naming the electorate for towns. In this well-expressed principle of government we find the reason why the people, in the Constitution of 1816, reserved to themselves the right to say, from time to time, by and through their representatives in the legislature, who should vote at town and township elections and why they did not fix, in a large measure, unalterably, such qualifications in the Constitution.

A construction consistent with the idea that no qualifications for voters at town elections were fixed in the Constitution, and that the fixing thereof was committed to the general assembly, was at once placed, by the legislature, upon the Constitution of 1816. The legislature, acting on the theory that it was authorized so to do by Art. 11, §15, of the Constitution, to wit: "All town and township officers shall be appointed in such manner as may be directed by law," passed in 1817 a general law, as follows: "Sec. 1. Be it enacted by the General Assembly of the State of Indiana, That hereafter whenever the inhabitants of any town in this state wish to become incorporated, for the better regulation of their internal police, it shall be lawful for the qualified voters of such town, who shall have resided six months therein, and *pursued any trade or occupation* during such time, being also residents, or who shall be

the *owner of any freehold property in said town,"* to assemble and vote whether they shall be incorporated.

"Sec. 3. Whenever the qualified voters of any town shall have decided in the manner aforesaid, that they wish to become an incorporated body, they may, on the next succeeding Monday, and annually thereafter, on the same day, choose by ballot, five freeholders as trustees." Acts 1818 p. 373.

This law adds several qualifications not required by the Constitution, and throws a light which has not been extinguished to this day, though sometimes dimmed, revealing the thought then in the minds of the people, that the constitutional qualifications did not define who should vote at town elections "for the better regulation of their internal police." The term "internal police," as here used, is defined as "The whole system of internal government of a city or town." New Standard Dictionary.

In addition to the above general act for the incorporation of towns, the legislature also, during the entire existence of the Constitution of 1816, authorized the incorporation of many towns by special act, or charter, and in each special charter, the legislature described and defined who should vote at elections of the town. The qualifications of voters thus described differ greatly from those named and fixed in the Constitution for other elections, and differ greatly as between the towns themselves; for instance:

(1820) Charlestown—"Every person resident in the corporation aforesaid, *having a legal or equitable title to real property* therein, shall be entitled to vote for trustees." Acts 1820 p. 42.

(1823) Lawrenceburgh—"the freemen of the town * * *." Acts 1823 p. 20.

(1828) Corydon—"Every person resident in the corporation, of the age of twenty-one years and upwards, and every person who is a qualified voter

144    SUPREME COURT OF INDIANA,

Board of Election Commissioners, etc. *v.* Knight—187 Ind. 108.

and resident of the county, having a. *legal or equitable title to property therein* shall be entitled to vote." Acts 1828 p. 30.

(1832) New Albany—"Each white male inhabitant of said town, *sane, and not a pauper,* being a citizen of the United States, and twenty-one years of age and upwards, who shall have the qualifications of a voter for state officers, and shall have resided within the bounds of the corporation of said town, six months next preceding such election, shall be entitled to vote." Acts 1832 p. 136.

(1836) Vincennes—"Each white male citizen of said Borough of twenty-one years and upwards, being either freeholders or householders in said borough." Local Laws 1836 p. 32.

(1836) New Albany—"Every qualified elector of this state, *not a pauper,* who shall have resided in the town for six months, next preceding election shall be entitled to vote." Local Laws 1836 p. 76.

(1838) New Boston—Three months' residence. Local Laws 1838 p. 53.

(1838) La Porte—"All free white male citizens of this State, of the age of twenty-one years and upwards, residing within the limits of this town, assessed for and having paid a town tax." Local Laws 1838 p. 59.

(1838) Greensboro—Qualifications to vote for member of legislature. "Provided, however, that this shall not be construed as to prevent any citizen freeholder from voting at any election after he shall have paid a public corporation tax." Local Laws 1838 p. 85.

(1846) Evansville—"Every free white male citizen of the age of twenty-one years, who has resided in the State one year, and in said city six months, and in the *ward* in which he offers his vote one month next preceding such election, shall be entitled to vote." Local Laws 1847 pp. 4, 5.

(1847) Indianapolis—"No person shall be qualified to vote for mayor and councilman who has not resided for the last six months preceding the election in the city, and *if not a householder,* who has not resided for the last twenty days preceding the election, in the *ward* in which he may offer his vote, and who shall not be a citizen of the State of Indiana." §3, Local Laws 1847 p. 57.

Many others might be quoted. This long-continued and consistent construction of the Constitution to the effect that the people thereby delegated to the legislature power to name the qualifications of voters at town elections, was not at any time, or in any manner, questioned by the people, by any branch of the state government, or by any litigation to which my attention has been called, or which I have found, and it thus has the force of positive law. *Hovey, Governor*, v. *State, ex rel.* (1889), 119 Ind. 386, 388, 21 N. E. 890.

I am not unmindful of the fact that it is argued herein that in placing in the Constitution the provision: "All town and township officers shall be *appointed* in such *manner* as shall be directed by law," the people used the word "appointed" in its narrow sense, excluding elections, and it is argued that even though the word "appointed" be broad enough to include elections, the people used the word "manner" as referring to the mode, or system of conducting elections, rather than to the agency making the selection. Decisions rendered in other states have been cited in this action in support of such argument. Such decisions, and the argument, are, in my opinion, of no weight, as against the construction of such words made from 1816 to 1851 by the people of Indiana, and by the general assembly of Indiana, to the effect that the word "appointed" is broad enough to include "election," and that the word "manner" refers to agency of choice, and that the general assembly had the power to say whether such town officers should be appointed and, if so, by whom, or that they should be elected and, if elected, by whom. The people of the state were justified, and this court is justified in construing the word "appoint" to be broad enough to cover election, since it was used in this connection by the Supreme Court of the United States in *McPherson*

146    SUPREME COURT OF INDIANA,

Board of Election Commissioners, etc. *v.* Knight—187 Ind. 108.

v. *Blacker* (1892), 146 U. S. 1, 27, 13 Sup. Ct. 3, 36 L. Ed. 869.

We find a further construction to the same effect in the Constitution of 1851. By the new Constitution the long-continued construction of the old was confirmed and settled as correct by the express declaration of the people, as follows:

Art. 15, §1: "All officers whose appointment is not otherwise provided for in this Constitution shall be *chosen* in such manner *as now is,* or as hereafter may be prescribed by law," and by the further declaration:

(Constitution, Schedule §4) "All acts of incorporation for municipal purposes shall *continue in force* under this Constitution until such time as the *General Assem-. bly* shall, in its discretion, modify or repeal the same." In this connection, it should be remembered that each of said acts of town incorporation then named the qualification of voters in such corporation. The continued propriety of local self-government was thus again recognized and asserted in 1851, and more positively asserted than in 1816. The Constitution of 1816 merely granted authority to the assembly to provide by law for elections in "towns and townships;" that of 1851, in the above quoted language, approved and continued in force the specific acts done by virtue of such authority, and continued the authority. The people in the Constitution of 1851 also preserved the distinction between the two classes of election herein noted; and did so in the same words used in the Constitution of 1816, to wit: "In all elections *not otherwise provided for by this Constitution,* every white male citizen * * *" and this distinction is in the Constitution today.

It had, however, been found by the people that the great variety of qualifications of voters prescribed by law for each town caused confusion, and that uniformity was more desirable; therefore, the legislature,

acting within the power granted by the Constitution of 1851, at its first session after the adoption of the Constitution of 1851, enacted that "in all *municipal elections* under *town and city* charters in this State, no other qualifications shall be hereafter required of any voter than such as is made necessary under the constitution of the State, *except* that the voter shall reside in the ward or district where he may offer to vote." 1 R. S. 1852 p. 373. At that time, 1852, the Constitution required for elections not otherwise provided for, i. e., state elections, as herein termed, only that a person should reside in the state six months to be entitled to vote in his township or precinct. The legislature did not deem this sufficient for protection of the ballot at town and city elections, and again exercised its power to provide for local self-government by requiring at town and city elections the voter should reside in a ward or district of the municipality. This requirement of residence in a ward was provided by the legislature for town and city elections because, in the absence of such a restriction, any person who had resided in the state six months, and who had just moved into the township, or precinct—precincts frequently covering the whole township—might, so far as the constitutional restrictions were concerned, vote at an election in any town located within the township or precinct, although he did not reside in the town.

The general assembly, at several later sessions before 1881, repeatedly asserted its power to designate electors for city and town elections. At some sessions the assembly deemed the qualifications required by the Constitution at state elections to be sufficient, and at other sessions deemed additional qualifications proper and necessary, as, for instance, in 1867 (Acts 1867 p. 113) the general assembly required a residence of *twenty* days in the city or ward to entitle one to vote at city

or town elections. This requirement was not in the Constitution. Although many sections of the town and city election law of 1867, last above mentioned, were repealed in 1869, the above requirement of twenty days' residence was by the legislature continued in force. This act relating to residence in a ward at municipal elections did not answer another complaint, however, which was prevalent at the time as to state elections, which complaint grew out of the fact that voters ·at state elections were not restricted by any smaller territorial area than the township or precinct, and this furnished opportunity for floating voters to repeat at state elections. This was the situation ten years later when Governor Hendricks in his message to the assembly of 1877 recommended that voting precincts be made so numerous and so small that all who offered to vote might be known, and that a reasonable period of residence in the precinct be prescribed, and in this message a residence of sixty days in the precinct was suggested. At that time precincts applicable to state elections were large, frequently as large as townships, and no period of residence therein was required. At that time precincts applicable to town and city elections were as small as wards, or smaller, and a period of residence therein was required. It is a fair inference, from this and other facts to be noted herein, that the Governor referred to state elections rather than town and city elections. Because of this recommendation of the Governor, the general assembly proposed, in 1877, an amendment to the Constitution, to be submitted to the people, adding to the qualifications of voters therein prescribed that voters should reside in the township sixty days and in the *ward,* or precinct, thirty days, and thus be entitled to vote in the precinct. This resolution was also passed by the session of 1879, was ratified by the peopl and became effective as an amendment in 1881.

Prior to this amendment the word "ward" had not appeared in the Constitution. It is argued that as a "ward" is necessarily a town and city subdivision, the use of this word, or the mention of the subdivision, in the Constitution, when considered with the desire to so amend the Constitution as to avoid abuses of the ballot, imports an intention on the part of the people to bring town and city elections into the class of elections "not otherwise provided for" in the Constitution; or, to state the matter in another form, imports an intention to thus destroy and annul the provision otherwise made in the Constitution for town and city elections, and thus take from the general assembly a power it had possessed and exercised for sixty-five years to provide for local self-government. An amendment of the town and city election laws would have cured any defect therein, but none of the kind existed. An amendment of the Constitution was necessary to cure a defect as to elections "not otherwise provided for,"—state elections. I do not find in the message of the Governor any suggestion that the right of local self-government, preserved for so many years in the Constitution, should be thus limited. The legislature had protected the ballot at town and city elections by prescribing small areas and a period of residence. The Governor and the legislature, in proposing the amendment, must have had in mind elections not so protected. As state elections covered and included the territory within all cities and towns of the state, it was evidently found convenient, in amending the Constitution, for the protection of state elections, to designate wards and precincts in towns and cities as limitations of voting areas to be added in the Constitution for voters at state elections,—for voters at elections "not otherwise provided for." The discussions, in the legislature at the session of 1877, of this proposed amendment to the Constitution were not preserved, or printed in any

report. The discussions of the same resolution at the session of 1879 are preserved, to some extent, in the brevier report of that session, and a reading of this report discloses no discussion whatever of a proposition to provide how and by whom town and city officers, should be elected. Had such a radical change been intended, had the people realized that by the amendment of 1881, by the use therein of the word "ward," they were removing from themselves one step farther, a right they had preserved to their direct representatives in the assembly, discussion and strong opposition would have developed. Had the people determined that it were better that the qualifications of electors at town and city elections be fixed, and not readily changed, they would not have left the matter to a mere inference from the word "ward," but would have used language fully and clearly expressing the idea that the amendment should apply to town and city elections, and would have expressly withdrawn town and city elections from the class otherwise provided for.

The legislature at several sessions, after the amendment of 1881, asserted its right to prescribe who should vote at town and city elections. The act of 1905 recognizes qualifications prescribed by the general assembly in addition to those prescribed in the Constitution. It reads: "In all municipal elections, no other qualifications shall be required of any voter than such as are made necessary in general elections, under the Constitution, and *laws of the state.*" (Acts 1905, §230, p. 383, §8884 Burns 1914.) If the amendment of 1881 covered the matter into the Constitution, why should the legislature further treat of the subject? Evidently the assembly, in its sessions of 1877 and 1879, did not intend that the amendment it then proposed should destroy its power to later say who should vote at town and city elections; at least it has denied such intent by its later acts

naming such electors. The ambiguity and need for construction of the Constitution, in this case suggested, continued until 1881. The amendment then made has, judging by the good-faith differences of opinion in this case, not removed, but has intensified the ambiguity. The general assembly has continued since 1881 to assert who shall vote at town and city elections, and a statute to that effect was in force at the time of the adoption of the act in question. Thus we have a long-continued, practical exposition of the meaning of the Constitution and of its amendment. This exposition has been so uniform, and is so persistent, that it removes all ambiguity, and establishes, or demonstrates, the existence of a principle, and that principle, local self-government, underlies the whole of this cause. Consistent with that principle, the general assembly has deemed it best that women shall vote at local elections. "If we find a principle established by long-continued practice, we must yield to it, unless we are satisfied that it is repugnant to the plain words of the Constitution." *Hovey, Governor,* v. *State, ex rel., supra; French* v. *State, ex rel.* (1895), 141 Ind. 618, 41 N. E. 2, 29 L. R. A. 113.

The prevailing opinion, and the concurring opinion, draw from the use of the word "ward," and other facts stated, one inference. I draw from the word "ward" and substantially the same facts an entirely different inference; and I submit that the latter is at least as well founded and reasonable as the former. The rule, under such circumstances, is that the inference which will sustain the law shall be indulged. Further, if doubt existed in my mind as to which inference should be drawn, that doubt should be resolved in favor of the validity of the law, if this can be reasonably done. "The power to declare a statute unconstitutional is one of the highest intrusted to a judicial tribunal, and is only to be exercised with the greatest care, and only

when there is no doubt of the unconstitutionality of the law. If there is any doubt in the mind of the court as to the constitutionality of a law, it must be resolved in favor of its validity." *City of Indianapolis* v. *Navin* (1898), 151 Ind. 139, 145, 47 N. E. 525, 51 N. E. 80, 41 L. R. A. 337, and citations therein.

It is argued by those opposed to the law that the qualifications fixed in the Constitution not only include all who shall vote at any and all elections but exclude all others as voters. This argument is of little force when we find in the same section an exception stating in effect that the qualifications do not apply to elections "otherwise provided for," and find elsewhere in the Constitution that the election here involved is otherwise provided for.

It is argued by those favoring the law that the Constitution only guarantees that males, twenty-one years of age, who have resided in the designated territory for a named period, may vote. In other words, that this guaranteed right shall not by legislation be taken from them; but that the provision is not meant to be exclusive of all others as voters; and, hence, the general assembly may provide that others may vote. This argument would be pertinent had the general assembly attempted to change the qualifications of voters for Governor or secretary of state, or any office created by the Constitution, as the Constitution does not say that these officers are in the class otherwise provided for, but does provide expressly who shall vote for these officers. The debate then would be: What power has the legislature over qualifications fixed by the Constitution? For the reasons stated, my opinion is not in the slightest conflict with the decision in *Gougar* v. *Timberlake* (1896), 148 Ind. 38, 46 N. E. 339, 37 L. R. A. 644, 62 Am. St. 487, as in that case Mrs. Gougar demanded a right to vote for officers the choice of whom was, by the Consti-

tution, committed to voters whose qualifications were fixed in the Constitution; and if it were conceded that the general assembly had power to permit others to vote at such elections, the assembly had not made any such provision. This opinion is also in entire accord with the general principles and rules of government announced in *Ellingham* v. *Dye* (1912), 178 Ind. 336, 99 N. E. 1, 99 N. E. 29, 231 U. S. 205, 58 L. Ed. 206, Ann. Cas. 1915C 200; and in *Bennett* v. *Jackson* (1917), 186 Ind. 533, 116 N. E. 921.

I agree with my associates that the assembly has power to provide that women may vote at school elections. In fact, the assembly has in several acts so provided. I do not agree, however, that the provision to that effect in the act of 1917 is so interwoven with the city election provision that it must fail with the latter. In my opinion the act of 1917 is severable as to each class of officers named therein, as if the provision for each class had been made by a separate act. If, therefore, the act is invalid as to any one class, such invalidity does not destroy the act as to other classes.

In my opinion, the judgment appealed from should have been reversed.

NOTE.—Reported in 117 N. E. 565, 650. Validity of a statute giving women the right to vote, Ann. Cas. 1915A 802.