Stephen M. GALLAGHER, and Kevin Mouser, Individually and Representatives of all Other Individuals Similarly Situated, Appellants (Plaintiffs Below),

v.

INDIANA STATE ELECTION BOARD; Alan Mills, Joseph Donnelly, and Donald Cox, in their Official Capacities as Members of the Indiana State Election Board, Marion County Election Board, and Marion County Board of Voter Registration, Appellees (Defendants Below).

No. 49S02–9208–CV–646.

Supreme Court of Indiana.

Aug. 28, 1992.

Richard A. Waples, Indiana Civil Liberties Union, John Wood, Indianapolis, for appellants.

Linley E. Pearson, Atty. Gen., Robert S. Spear, John M. White, Deputy Attys. Gen., Kristie L. Hill, Corp. Counsel City–County Legal Div., J. Murray Clark, Indianapolis, for appellees.

SHEPARD, Chief Justice.

Appellants Stephen Gallagher and Kevin Mouser were registered in plenty of time to vote in the 1988 general election in Marion County, but they moved out of their precincts in the month before election day. Gallagher moved to Hendricks County; Mouser moved to another precinct within Marion County. As a result of these moves, Indiana's voting laws restricted their ability to vote. Both sought full franchise by filing a class action suit on behalf of themselves and others similarly situated. The trial court upheld the voting statutes. The Court of Appeals reversed, *Gallagher v. Election Bd.* (1991), Ind.App., 579 N.E.2d 649, holding that the statute which limits voting rights of those who move after the registration deadline violates the equal protection clause of the fourteenth amendment.

The Indiana State Election Board, Marion County Election Board, and Marion County Board of Voter Registration, appellees (collectively referred to as the "Election Board"), have petitioned for transfer. Because this case involves questions of substantial importance, namely the constitutionality of our state's voting laws, we today grant appellees' petition.

We observe that good public policy would extend the opportunity to register and vote to as many Americans as possible, and we have examined this case with that idea in mind. Still, the method of expanding the franchise is a matter placed in the hands of the people of Indiana speaking through their constitution and through their elected representatives. The role of this Court is a relatively specific one, namely, deciding the two constitutional questions which arise in this litigation:

1. Whether Article II, § 2 of the Indiana Constitution creates a "day of record" for purposes of voting, whereby the precinct in which a voter maintains residency on the thirtieth day before an election is that voter's voting precinct, even if the voter moves from that precinct before the election, and

2. Whether the statutes which govern voting by registered voters who move to a new precinct within thirty days of an election violate the equal protection clause of the United States Constitution.

*I. The Statutory Framework*

Article II, § 2 of the Indiana Constitution defines who may vote in Indiana: "Every citizen of the United States, of the age of eighteen (18) years or more, who has been a resident of a precinct thirty (30) days immediately preceding such election, shall be entitled to vote in that precinct." Because it is essential to safeguard the ballot box and protect the integrity of elections, Article II, § 14 further directs the General Assembly to "provide for the registration of all persons entitled to vote." Thus, our constitution "not only confers upon the General Assembly the power to make illegal voting an impossibility by a proper system of registration, but it makes it the imperative duty of that body to exercise that power." *Morris v. Powell* (1890), 125 Ind. 281, 296, 25 N.E. 221, 226.[1]

The General Assembly has fulfilled its duty by enacting a series of voter registration laws found in Title 3 of the Indiana Code. Those laws treat voters who change

---

1. *See also* Laurence H. Tribe, AMERICAN CONSTITUTIONAL LAW 1084 (2nd ed. 1988) ("Although free and open participation in the electoral process lies at the core of democratic institutions, the need to confer the franchise on all who aspire to it is tempered by the recognition that completely unlimited voting could subvert the ideal of popular rule which democracy so ardently embraces. Moreover, in deciding who may and who may not vote in its elections, a community takes a crucial step in defining its identity. If nothing else, even though anyone in the world might have some interest in any given election's outcome, a community should be empowered to exclude from its elections persons with no real nexus to the community as such.")

counties differently than voters who move within a county. Essentially, those who move to another county within thirty days of election day cannot vote in an Indiana election; those who move to another precinct within the same county can. It is this disparate treatment that, in part, has caused this lawsuit.

Before explaining these provisions in further detail, we first note that any time a voter moves to a new precinct, he must have his registration transferred to that new precinct no later than the twenty-ninth day prior to election day to enable him to vote in the new precinct. Ind.Code Ann. K § 3–7–3–5 (West Supp.1992). Consequently, a resident of a precinct who is otherwise qualified cannot vote in the new precinct if he became a precinct resident within thirty days of an election.

He can, however, vote *in his former precinct* if his new precinct is *in the same county* and he has completed an affidavit at the county election office requesting a transfer of registration. He cannot return to his former precinct, however, and vote in an Indiana election if he has moved to another county during the last 30 days.[2]

Gallagher and Mouser each moved within thirty days of Election Day 1988, after the voter registration deadline had passed. Both were allowed to vote for President and Vice President in their former precincts as required by federal law, but that is all. Gallagher's state and local franchise was denied because he had moved to another county, Mouser's because he had not completed an affidavit at the Marion County election office as required.[3]

## II. Indiana Constitutional Question

■ Gallagher and Mouser first challenge the trial court's conclusion that Article II, § 2 of the Indiana Constitution does not establish a "record date" for purposes of determining voter eligibility. They interpret this provision to say that a voter's residence on the thirtieth day prior to an election is his residence for voting purposes, even if he moves to another precinct during the thirty-day interim between the registration deadline and election day. The Court of Appeals rejected this interpretation and held that Article II, § 2 unequivocally requires precinct residency for thirty continuous days prior to an election. Writing for the court, Judge Shields noted:

> The key language at issue is: "Every citizen ... *who has been a resident of a precinct thirty (30) days immediately preceding such election ...*" Ind. Const. art 2, § 2. The phrase *"has been* a resident ... thirty (30) *days"* indicates the criterion involves a *period of time* rather than a specific point in time. Thus the language of Ind. Const. art. 2, § 2 is unambiguous and clearly does not provide a "day of record" for purposes of voting and to that extent we agree with the trial court.

*Gallagher,* 579 N.E.2d at 652.

We think Judge Shields is correct about the plain meaning of the section in question. Moreover, the known history of this provision leads to the same conclusion.

"In placing a construction upon a constitution or any clause or part thereof, a court should look to the history of the times, and examine the state of things existing when the constitution or any part thereof was framed and adopted, to ascertain the old

---

**2.** Those who move from one county to another in the month before election are not completely disenfranchised. They can return to their former precincts and vote in the presidential election. The right to vote for President and Vice President notwithstanding certain state registration laws is mandated by 42 U.S.C. § 1973aa–1(e) (1988), a provision of the Voting Rights Act of 1970. Thus, while voters like Gallagher and Mouser can be denied their state franchise for failure to comply with durational residency requirements, they must be allowed to vote for President and Vice President, so long as they were properly registered in their old precincts before moving within thirty days of the election. *See, also,* Ind.Code Ann. § 3–7–4–1 to –6 (West 1988).

**3.** Ind.Code § 3–7–8–2 was amended in 1991. The deadline for completing the transfer affidavit is now 4 p.m., Monday, the day before the election. Prior to that time, the deadline for intra-county movers to request a registration transfer was the last Friday before the election. This is the deadline Mouser missed when he waited until Monday to go to the election office. *See* Ind.Code Ann. § 3–7–8–2(b) (West 1988).

law, the mischief, and the remedy." *State v. Gibson* (1871), 36 Ind. 389, 391. The history of section 2 is accurately chronicled in Judge Metz' Conclusions of Law, numbers two through seven. He described the old law, the "mischief," and the remedy as follows:

2. Between 1921 and 1976, Article 2, Section 2 of the Indiana Constitution read as follows:

In all elections not otherwise provided for by this constitution, every citizen of the United States, of the age of twenty-one years and upwards, who shall have resided in the state during the six months, and in the township sixty days, and in the ward or precinct thirty days, immediately preceding such election, shall be entitled to vote in the township or precinct where he or she may reside.

3. The Twenty–Sixth Amendment to the United States Constitution, ratified July 5, 1971, lower[ed] the minimum age requirement for voting in all elections to eighteen, thus effectively modifying Article 2, Section 2 of the Indiana Constitution.

4. *Dunn v. Blumstein*, 405 U.S. 330 [92 S.Ct. 995, 31 L.Ed.2d 274] (1972) invalidated, under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, Tennessee's durational residence requirements of twelve months in the state and three months in the County. The Court held unconstitutional all state voting requirements which called for a duration of residence longer than that necessary to complete the administrative tasks which state law required for registering voters and establishing eligibility lists for elections. *Id., Affeldt v. Whitcomb*, 319 F.Supp. 60 [69] (N.D.Ind.1970), *aff'd*, 405 U.S. 1034 [92 S.Ct. 1304, 31 L.Ed.2d 576] (1972) (invalidating Indiana's requirement of sixth months residency in the state); *Jackson v. Bowen*, 420 F.Supp. 315 (S.D.Ind.1976) (invalidating Indiana's requirement of sixty days residency in the township).

5. Article 2, Section 2 of the Indiana Constitution was amended in 1976 to conform to federal constitutional limitations on state voting requirements as to age and duration of residence. The amended section read as follows:

Every citizen of the United States, as of the age of eighteen years or more, who has been a resident of the precinct thirty days immediately preceding such election, shall be entitled to vote in the precinct where he or she may reside.

6. In 1976 the General Assembly passed a bill, House Enrolled Act 1239, which would have added to the election statutes prescribing residence requirements the following: "A voter's residence thirty-one (31) days before an election is deemed to be his residence from that day until the day after the election, any other provision of the laws of this state to the contrary notwithstanding." Governor Bowen vetoed that bill, stating in his veto message: "The residency requirements of Article 2, Section 2 of the Indiana Constitution can only be altered by amending that constitutional article." (1975 House of Representatives Journal, p. 1031 (April 30, 1975)). The General Assembly did not override the Governor's veto, therefore House Enrolled Act 1239 did not become law.

7. In 1984, the General Assembly again amended Article 2, Section 2 of the Indiana Constitution. This amendment included two changes. One, "who has been a resident of the precinct" became "who has been a resident of a precinct." Two, "in the precinct where he or she may reside" became "in that precinct."

Record at 294–295.

The Election Board maintains that the slight alteration effected by the 1984 amendment was adopted as part of a broader resolution which merely proposed stylistic changes designed to make the Indiana Constitution more understandable through the use of modern language.[4] We

4. The 1984 constitutional amendment was initiated by the 102nd General Assembly in House Joint Resolution 1, entitled "A JOINT RESOLUTION proposing to amend the Constitution of the State of Indiana by updating certain antiquated style, language, or provisions." 1982

think this interpretation is correct. Judge Metz also noted that *after* the 1984 amendment, the General Assembly in 1987 added subsections (b), (c) and (d) to Ind.Code § 3-7-8-2, to preserve full voting rights for those such as Mouser who move to another precinct within the same county after the registration deadline.[5] "If ... Article 2, Section 2 of the Indiana Constitution establishes a 'record date', then the passage of [this legislation] would make no sense since the Indiana Constitution would already allow a voter to do this," wrote the judge. Record at 296. We concur.

The mischief to be remedied by these various amendments was clear: our legislature sought to make Indiana's constitutional provisions dealing with the franchise consistent with federal Constitutional mandates concerning minimum voting age and durational residency requirements. It also sought to remove any gender bias that might be perceived in so important a document. The evidence does not reflect any change in policy toward those voters who change their residency in the waning days before an election. The trial court was correct in concluding that Article II, § 2 does not recognize a "record date" for purposes of establishing residency entitling one to vote.[6]

### III. Equal Protection Claims

Appellants next allege that the statute which limits voting rights of those who move after the registration deadline violates the equal protection clause of the United States Constitution.[7] The Court of Appeals, noting that "the right to vote has long been accorded the status of a fundamental right," utilized strict scrutiny in assessing the constitutionality of the statute. *Gallagher*, 579 N.E.2d at 652. The court concluded that the distinctions in voting rights did not promote any "compelling state interest" and hence were unconstitutional. *Id.* at 652–53.

The use of strict scrutiny in this context was error. While it is indisputable that the right to vote is fundamental and thus certain encroachments trigger strict scrutiny, *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), the Supreme Court has also made clear "that a government unit may legitimately restrict the right to participate in its political processes to those who reside within its borders." *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 68–9, 99 S.Ct. 383, 388–89, 58 L.Ed.2d 292 (1978). The Supreme Court took for granted that a thirty-day residency requirement met the strict scrutiny test in *Dunn.* Later it upheld a fifty-day requirement upon a showing of a particularized need for time for administrative work. *Marston v. Lewis*, 410 U.S. 679, 93 S.Ct. 1211, 35 L.Ed.2d 627 (1973). As Justice Marshall pointed out in *Dunn*, the appropriate equal protection test varies, "depending upon the interest affected or the classification involved." *Dunn*, 405 U.S. at 335, 92 S.Ct. at 999. Appellants' right to vote is fundamental. They do not, however, enjoy a fundamental right to vote in a precinct in which they do not reside. Thus we believe the appropriate inquiry is whether "any state of facts reasonably

---

5. 1987 Ind.Acts P.L. 3–1987, § 71.

6. We note that the General Assembly may not confer voting rights on those not enfranchised by the Indiana Constitution. *Board of Election Commissioners, etc. v. Knight* (1917), 187 Ind. 108, 117 N.E. 565, 650. None of the parties to this litigation have the interest or the standing to contest the additional voting rights the legislature has granted to intra-county movers.

7. U.S. CONST. amend. XIV, § 1. ("No state shall ... deny to any person within its jurisdiction the equal protection of the laws.")

Ind.Acts P.L. 231. Amendments to thirty-four provisions of the Constitution were proposed. Many of the proposed amendments, including the amendment to Article II, § 2, adopted gender-neutral terms or removed all reference to gender. *See, e.g.,* section 1 of Article II, changed from "all *men* are created equal" to "all *people* are created equal", *Id.* at § 2; section 16 of Article IV changed from "*He* shall take care that the laws *be* faithfully executed" to "*The Governor* shall take care that the laws *are* faithfully executed." *Id.* at § 20. (Emphasis added). Thus we are persuaded, inter alia, by the terms of the Joint Resolution and the de minimis nature of the alteration to Article II, § 2, that the General Assembly desired no substantive change.

may be conceived to justify" the distinction in voting rights at issue in this case. *Holt Civic Club*, 439 U.S. at 74, 99 S.Ct. at 392 (quoting *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719, 732, 93 S.Ct. 1224, 1232, 35 L.Ed.2d 659 (1973)). Because Gallagher and Mouser represent different classes of partially disenfranchised voters—those who move to a different county and those who move within a county—we examine their claims separately, turning first to Gallagher.

### A. Moving Across County Lines

■ Gallagher's complaint is not with the distinction drawn between his class of voters and those who maintain continuous residency in a precinct and thus retain the full franchise. Rather, he attacks the disparate treatment his class endures compared to the accommodations provided by Ind.Code § 3–7–8–2 for those who move *within* a county. Gallagher, who merely moved across the county line, wonders why he is allowed to vote only for President and Vice President, while those who move on the same day to another precinct within the county have access to the entire ballot.[8]

The Election Board argues persuasively in response that the legislature could have reasonably assumed that a move from one precinct to another, within the same county, was less likely to result in a voter changing congressional or legislative districts and would be less likely to diminish the voter's legitimate interest in the local election, thus the disparate treatment of the two groups. The following hypotheticals further illustrate the reasonableness of the legislature's action:

Suppose a voter living in Marion County moves to another precinct in the county two weeks before Election Day. If he were allowed to vote in the new precinct, the ballot would look very much like the ballot in his old precinct. *Perhaps* he has moved into a different state legislative district, in which case that portion of the ballot would be different. But it is also entirely possible that in spite of changing precincts, he would still remain in the same legislative districts. And, of course, the county offices on the ballot would be the same.

Now suppose the same voter, instead of moving to another precinct in Marion County, moves to Vanderburgh or St. Joseph or some other county far removed from the center of the state. He is far more likely to have moved into a new congressional district. His state legislative districts are certainly different. And he has lost any stake in local races in Marion County. Except for the fact that Gallagher moved a much shorter distance (to Hendricks County, adjacent to Marion County), he fits this example on all fours, and demonstrates why denial of the full franchise to his class is not unconstitutional. His nexus to the community is more attenuated than that of voters who relocate within the borders of their home county.

Because Gallagher cannot meet the thirty-day durational residency requirement, his franchise can be abridged without offending the Constitution. *See Dunn*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274; *Marston*, 410 U.S. 679, 93 S.Ct. 1211, 35 L.Ed.2d 627 (1973). Only his right to vote in the presidential election, originally mandated by Congress,[9] is preserved. Admittedly, it does not seem fair that Gallagher, who remained a resident of the state, was not allowed to vote for Governor or U.S. Senator—two races in which he retained a stake. Indeed, on the witness stand he said he could accept restrictions on his right to vote for local offices, so long as his franchise with regard to statewide races was preserved. Record at 363. To paraphrase the declaration of the U.S. Supreme Court in *Holt*, Gallagher's suggestion "[f]rom a political science standpoint ... may be sound, but this Court does not sit to determine whether [the General Assembly] has chosen the soundest or most practical" manner of safeguarding the ballot box and ensuring the integrity of elections.

8. Of course, these intra-county movers must comply with the transfer affidavit requirements of Ind.Code § 3–7–8–2(c).

9. *See supra* note 2.

*Holt,* 439 U.S. at 73–4, 99 S.Ct. at 391–92. Authority to make these judgments resides in the legislature, and Indiana citizens are "free to urge their proposals to that body." *Id.* at 74, 99 S.Ct. at 392. The General Assembly might very well conceive a more precise system that protects a broader exercise of the franchise for voters like Gallagher while still preventing dilution of local residents' votes, but the fourteenth amendment to the United States Constitution does not require it.

### B. Moving Inside the County

Mouser's equal protection claim fails, as well. As an intra-county mover who failed to initiate the transfer of his registration in time to return to his old precinct and vote a complete ballot, Mouser claims a violation of equal protection based on the fact that those who complied with the requirements of the statute were accorded full voting rights and he was not. As an equal protection classification, this claimed distinction seems untenable, somewhat akin to a delinquent taxpayer who alleges an equal protection violation because he was unable to get to the Post Office by midnight on April 15th. Nonetheless, we proceed to review Mouser's claim to determine if the statute passes the rational basis test.

Of controlling significance is the fact that Mouser could have executed the required transfer affidavit in time to vote in his old precinct, but failed to do so. *See Rosario v. Rockefeller,* 410 U.S. 752, 757, 93 S.Ct. 1245, 1249, 36 L.Ed.2d 1 (1973). Mouser testified that after moving on October 27, 1988, he attempted to call the election office two or three times a day the week before the election but the line was busy each time he called. Record at 472, 474. By the time he went to the election office in person, on Monday the day before the election, it was too late to fill out the affidavit, since the deadline at the time was the previous Friday.[10] If Mouser's plight can be characterized as disenfranchisement at all, it was not caused by Ind.Code § 3–7–8–2, but by his own failure to take timely

steps to fulfill its minimal requirements. *Id.* at 758, 93 S.Ct. at 1250. It is apparent that the election office needs more phone lines, but that problem is not within our jurisdiction. We can, however, pass judgment on the constitutionality of state statutes, and it is our opinion that the statute Mouser challenges easily passes the rational basis test. Common sense dictates that administrative convenience is served by a system requiring transfer affidavits to be executed in the office where the voting registration records are kept. And, at the very least, the statutory scheme at issue might help ensure that voters who move after the registration deadline actually inform the election office so a transfer of registration can be effected. Their franchise depends upon it. If voters like Mouser can be disenfranchised entirely, *see Dunn,* 405 U.S. 330, 92 S.Ct. 995; *Marston,* 410 U.S. 679, 93 S.Ct. 1211, we find no constitutional violation in conditioning the dispensation of legislative grace on compliance with such a modest procedure.

The statutes do not violate equal protection guarantees. The trial court is affirmed.

DeBRULER, GIVAN, DICKSON, and KRAHULIK, JJ., concur.

---

**10.** As the statute stands today, he would be timely. *See supra* note 3.