Vincent ORANGE, Petitioner,

v.

**DISTRICT OF COLUMBIA BOARD OF ELECTIONS AND ETHICS, Respondent.**

No. 93–AA–926.

District of Columbia Court of Appeals.

Argued Aug. 6, 1993.

Decided Aug. 10, 1993.

Johnnie Landon, admitted by the court pro hac vice, with whom Vincent Orange was on the brief, for petitioner.

William H. Lewis, with whom Alice P. McCrory–Miller was on the brief, for respondent.

Lutz Alexander Prager, Asst. Deputy Corp. Counsel, with whom John Payton, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, were on the memorandum, for the District of Columbia as amicus curiae.*

Before TERRY, FARRELL and WAGNER, Associate Judges.

FARRELL, Associate Judge:

In response to a timely challenge by a registered qualified elector, D.C.Code § 1–1312(*o*)(1) (1992), the Board of Elections and Ethics disqualified petitioner, Vincent Orange, as a candidate for the special elec-

---

\* The written submissions of respondent and the Office of Corporation Counsel, prepared under considerable time pressure, have aided us greatly in resolving this expedited appeal.

tion scheduled for September 14, 1993, to fill the vacancy in the position of Chairperson of the Council of the District of Columbia created by the death of John Wilson. The Board removed petitioner's name from the ballot because he had failed to file a nominating petition signed by the requisite number of duly registered voters, as required by D.C.Code § 1–1312(j)(1). Petitioner brought this expedited appeal. D.C.Code § 1–1312(o)(2). We affirm the decision of the Board.

## I.

D.C.Code § 1–1312(j)(1) provides that, to be placed on a ballot for election to city-wide office, an otherwise qualified candidate must file a petition with the Board signed by 3,000 "duly registered" voters or by 1½% of all duly registered voters in the District, whichever is fewer. Of key importance to the present case, D.C.Code § 1–1312(o)(3) provides that:

> [f]or the purpose of verifying a signature on any petition filed pursuant to this section, the Board shall first determine that the address on the petition is the same as the residence shown on the signer's voter registration record. If the address is different, the signature shall not be counted as valid unless the Board's records show that the person was registered to vote from the address listed on the petition at the time the person signed the petition.[1]

Although petitioner filed a nominating petition containing 4,129 signatures, the Board determined that 1,293 challenged signa-

tures were invalid, leaving 2,837 valid signatures or 163 (5.4%) fewer than the number required. Of the invalidated signatures, petitioner contests the Board's decision only as to 589, representing names on the petition which matched a name or names on the voter registration roll, but whose accompanying addresses did not match the address of the person on the Board's records as required by § 1–1312(o)(3).[2]

## II.

Petitioner contends that the Board's application of § 1–1312(o)(3) so as to invalidate the 589 signatures by persons for whom a corresponding name (but a different address) appeared in the Board's record of registered voters was unconstitutional. His argument is essentially twofold. First, he maintains that the Board has denied him equal protection of the laws by arbitrarily distinguishing between two classes of "duly registered" voters who have changed their addresses: those who, despite not having notified the Board of the change of address, may still vote on election day by submitting a change of address form (and other information the Board by regulation may require) at the polling place at the time of voting, D.C.Code §§ 1–1311(i)(3), (4), & (5); 3 DCMR § 716 ("Voting The Special Ballot"); and, on the other hand, those who by operation of § 1–1312(o)(3) may not be counted as signers on a nominating petition if their individual addresses listed on the petition do not match the address of a named person on the Board's

1. D.C.Code § 1–1312(o)(3) was enacted by the Council of the District of Columbia after this court had held that a similar Board regulation was incompatible with the electoral law as it was then written. *Harvey v. District of Columbia Bd. of Elections & Ethics*, 581 A.2d 757 (D.C.1991).

   Like § 1–1312(o)(3) itself, other provisions of the District's election law stress the need for voters to keep addresses current. Voter registration may be suspended if voters do not notify the Board of a change of address within thirty days of moving. D.C.Code § 1–1311(i)(1). If the Board learns of a move without notice from the voter, it is required to request the voter to confirm his or her address. § 1–1311(j)(1)(A). If the voter does not respond within thirty days,

the Board must suspend the registration. § 1–1311(j)(2).

2. Implementing § 1–1312(o)(3), title 3 DCMR § 1607.4 declares that "[a] signature shall not be counted as valid unless the date signed, the voter's signature, and the voter's residence address, as listed on the Board's records[,] appear on the petition." Similarly, a document issued by the Board to candidates seeking to have their name placed on the ballot explains: "The people who sign your petition may be registered with any political party—as long as they are properly registered to vote in D.C. and as long as their address on the petition matches the address on file with our office on the date that the petition is signed."

records. This argument rests upon petitioner's erroneous assertion that the Board has "concede[d] that 589 of the challenged petition signatures that were disqualified *were indeed registered voters*" (emphasis added). The Board did not make this concession, nor could it legally have done so. Section 1–1312(*o* )(3) is unambiguous in providing that, for purposes of verifying signatures on a nominating petition, a person's signature "shall not be counted as valid" unless the Board's records show the person to be "registered to vote from the address listed on the petition at the time the person signed the petition." In the Amended Challenge Report prepared on July 23, 1993, and furnished to petitioner, the Registrar of Voters explained that the 589 signatures were defective precisely because they were accompanied by addresses that "did not match an address on the voter roll as required by D.C.Code § 1–1312(*o*)(3)." Likewise, the Board's order sustaining the challenge to these signatures made clear its "rejection of [the] 589 signatures whose address on the petition did not match the Board's records," citing § 1–1312(*o* )(3).

3. Relying on *In re Haworth*, 258 A.2d 447 (D.C. 1969), petitioner makes what amounts to a statutory argument that the phrase "the Board's records" in § 1–1312(*o* )(3) should be read to include the nominating petition itself and names and addresses contained therein. In other words, a District of Columbia address on the petition accompanying a signature should, at least as to at-large elections, be "prima facie" proof that the signer is registered and has merely changed address. Petitioner's interpretation would rewrite the statute: instead of the statutory requirement that a signature and address in the petition be verifiable *against* the Board's records, it would reconstitute the petition as *part of* the Board's records at least "prima facie," thus placing on the Board the duty to disprove registration, contrary to the plain intent of the statute ("the signature shall *not* be counted unless ...").

In *Haworth*, where the signers were apparently conceded to be "qualified elector[s] duly registered in the District of Columbia," *id.* at 449, the only issue was whether the Board "was reasonable in its conclusion that the nominating petition could be considered as part of the records of the Board for purposes of notifying it of a change of address." *Id.* No statute such as § 1–1312(*o* )(3) existed at the time which, as to

Thus, petitioner's equal protection argument starts from a false premise. The 589 signatories were never determined to be duly registered, and hence they were not treated differently from *other* persons who are registered but have changed address without notifying the Board. Indeed, the very reason § 1–1312(*o* )(3) was enacted was the Board's inability otherwise, within the narrow time limit for validating challenged petitions, *see* § 1–1312(*o* )(2), to determine efficiently whether a name and address among the potential thousands on a nominating petition represents an actual registered voter. *See Harvey, supra* note 1, 581 A.2d at 758.[3]

### III.

We therefore turn to petitioner's primary contention, that by applying § 1–1312(*o* )(3) in accordance with its terms, the Board denied him due process of law and "infringed the [presumably First Amendment] rights of a class of voters who have expressly stated that they would like [p]etitioner's name to appear on the ballot."[4]

Any election law, " 'whether it governs the registration and qualification of

nominating petitions, limited "duly registered" voters to those who were registered to vote from the individual addresses listed on the petition at the time the person signed the petition. Thus a similar "conclusion" now by the Board that a nominating petition, without more, was proof that the voter was registered and had merely changed address would contravene the statute. Moreover, *Haworth* was decided at a time when the Board had no "prescribed procedure for notifying it of a change of address," *id.* at 449, a situation very different from the present statutory regime, *see* note 1, *supra.* Therefore, as the Board tells us, it would never reach the conclusion now that we sustained as a reasonable exercise of its judgment in *Haworth.*

4. We assume solely for the sake of argument, but *dubitante,* that merely by submitting more than 3,000 signatures in the first place, petitioner acquired a "property interest" in being placed on the ballot that entitled him to due process protection. We likewise assume that petitioner, as a candidate, may assert the First Amendment rights of voters "to associate or to choose among candidates," *Anderson v. Celebrezze,* 460 U.S. 780, 788, 103 S.Ct. 1564, 1569, 75 L.Ed.2d 547 (1983), that is, their interest in having him placed on the ballot.

voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends.' " *Burdick v. Takushi,* —— U.S. ——, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992) (quoting *Anderson v. Celebrezze, supra* note 4, 460 U.S. at 788, 103 S.Ct. at 1569). As a practical matter, "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974). Consequently, in judging the constitutionality of electoral laws, the Supreme Court applies a "flexible standard" that varies with the severity of the electoral restrictions:

> [W]hen [voting] rights are subject to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed,* 502 U.S. [——, ——,] 112 S.Ct. 698, 705 [116 L.Ed.2d 711] (1992). But when a state election law provision imposes only "reasonable nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters," the State's important regulatory interests are generally sufficient to justify the restrictions, *Anderson, supra,* 460 U.S. at 788 [103 S.Ct. at 1569]; *see also id.* at 460 U.S. 788–89 n. 9, 103 S.Ct. at 1570 n. 9.

*Burdick,* —— U.S. at ——, 112 S.Ct. at 2063.

*Burdick* held a Hawaii law which prohibits write-in voting constitutional because it "imposes only a limited burden on voters' rights to make free choices and to associate politically through the vote." *Id.* [—— U.S. at ——, 112 S.Ct. at at 2066.[5] The Court noted that although write-in votes are prohibited by the Hawaii law, the statute provides other reasonable methods by which a voter's candidate of choice can appear on the ballot. *Id.* —— U.S. at ——, 112 S.Ct.

at 2064–65. Those methods provide "easy access" until a cutoff date two months before the election. *Id.* —— U.S. at ——, 112 S.Ct. at 2065. As a result, only those voters who do not identify their candidates of choice until shortly before the election are precluded from having their candidate appear on the ballot. Any interest, however, that "the candidate and his supporters may have in making a late rather than early decision to seek independent ballot status" is not constitutionally significant. *Id.* —— U.S. at ——, 112 S.Ct. at 2065 (quoting *Storer v. Brown,* 415 U.S. at 736, 94 S.Ct. at 1282). Since the Hawaiian law imposes only a slight burden on voters' rights, the Court concluded, "the State need not establish a compelling interest to tip the constitutional scales in its direction" given its interest in deterring "unrestrained factionalism" and "sore-loser candidates."

■ The Supreme Court's flexible standard in evaluating election laws applies to challenges by candidates unsuccessful at being placed on the ballot. The Court has repeatedly recognized that states have legitimate interests in having candidates make preliminary showings of substantial public support to avoid overloaded ballots, frivolous candidacies, wasteful election costs, and voter confusion. *Munro v. Socialist Workers Party,* 479 U.S. 189, 193–94, 107 S.Ct. 533, 536, 93 L.Ed.2d 499 (1986); *Anderson v. Celebrezze,* 460 U.S. at 788–89 n. 9, 103 S.Ct. at 1569 n. 9; *American Party of Texas v. White,* 415 U.S. 767, 782 & n. 14, 94 S.Ct. 1296, 1307 & n. 14 (1974); *Jenness v. Fortson,* 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971). The state also has a legitimate interest in preventing election fraud. *Marston v. Lewis,* 410 U.S. 679, 681, 93 S.Ct. 1211, 1212, 35 L.Ed.2d 627 (1973); *see also Hoffman v. Maryland,* 928 F.2d 646, 649 (4th Cir.1991) ("[k]eeping accurate, reliable and up-to-date voter registration lists is an important state interest").

---

**5.** *Burdick* analyzed a Hawaiian electoral law under the Fourteenth Amendment, which does not directly apply to the District of Columbia. The Supreme Court has, however, applied Four-

teenth Amendment jurisprudence to the District through the Due Process Clause of the Fifth Amendment. *See Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954).

The Court has therefore upheld electoral laws requiring the signatures of well over one percent of the electorate. *Norman v. Reed,* —— U.S. at ——, 112 S.Ct. at 708 (two percent of electorate in each district); *Jenness v. Fortson,* 403 U.S. at 438–39, 91 S.Ct. at 1974 (five percent of registered voters). The *Jenness* law was constitutional because it imposed no "suffocating restrictions" on nominating petitions: voters could sign more than one candidate's petition; the signer was not required to state that he would vote for the candidate; an individual registered since the previous election was eligible to sign; and no signature needed to be notarized. *Id.*

■ Applying these standards to the District's election laws, it is clear that the requirements for running for city-wide office are not onerous. A candidate needs the signatures of fewer than one percent of the electorate, far fewer than were needed in *Jenness.* (Under the *Jenness* law, petitioner here would have had to obtain about 16,200 valid signatures, five percent of the District's voters). As in *Jenness,* District registrants can sign more than one candidate's petition; they need not give assurance that they will vote for the candidate; and they can be recently registered. As in *Jenness,* but unlike the situation in other states, voters' signatures need not be notarized. *Id.* at 439 n. 20, 91 S.Ct. at 1974; *cf. American Party of Texas v. White,* 415 U.S. at 787, 94 S.Ct. at 1309 (notarization requirement is constitutional). Indeed, the ease with which candidates can comply with the election law can be inferred from the current election. Petitioner had forty-one days to collect 3,000 valid signatures. The Board represents that of the seven candidates who submitted petitions, only two, including petitioner, did not reach the threshold of 3,000 signatures.

A candidate can avoid petitioner's fate by taking elementary precautions. First, in accordance with the instructions received from the Board, note 2, *supra,* the candidate can inform those willing to sign the petition of the importance of listing their current registration address. *See Harvey, supra* note 1, 581 A.2d at 758 ("[A] direction to candidates to secure registration addresses of persons who sign nominating petitions is a reasonable means of facilitating the Board's verification process"). Furthermore, since the Board's voter records are publicly available throughout the petition period, that period (here forty-one days) provides adequate time for the candidate's supporters to verify that each signer is registered at the address listed in the petition. That is not significantly more difficult for the candidate and his supporters before filing a petition than it is for challengers and the Board once the petition has been filed. *See* D.C.Code § 1–1312(*o*)(1) (10–day period in which to challenge validity of petition); § 1–1312(*o*)(2) (Board "shall determine the validity of the challenged nominating petition not more than 15 days after the challenge has been filed"). If it appears that signers have given addresses other than the ones at which they are registered, candidates may still canvass for additional signatures.[6] And, to some extent, section 1–1312(*o*)(3) itself facilitates compliance with the address requirement by allowing proof to be presented that a voter had notified the Board of the change of address at the time of signing.

■ Once it is clear that § 1–1312(*o*)(3) is not "severe" in its burden, *Burdick, supra,* it is constitutional if it is a rational and nondiscriminatory exercise of the state's power to regulate access to the ballot. *Burdick,* —— U.S. at ——–——, 112 S.Ct. at 2063–64. D.C.Code § 1–1312(*o*)(3) is nondiscriminatory since all candidates have the same opportunities and face the same restrictions. The election law does not prefer incumbents over challengers; party candidates over independents; or perennial aspirants over political newcomers.[7]

---

6. We need not consider whether § 1–1312(*o*)(1) would permit the additional step of assisting those who have already signed the petition with notifying the Board *post hoc* of address changes.

7. Unsuccessful applicants for listing are not completely prevented from competing in an election. They may still run as write-in candidates. *Unity Party v. Wallace,* 707 F.2d 59, 62 (2d Cir.1983) (write-in candidacy is acceptable

The statute also is rational. It is obviously designed to prevent election fraud by giving a candidate's challengers and the Board a simple, relatively inexpensive, yet reasonably accurate way of determining whether signatures belong to registered voters. While other methods may be equally accurate, they are substantially more burdensome. For example, notarization of each signature would be time consuming and difficult for both candidates and voters. Obtaining and reviewing testimony or affidavits from hundreds or thousands of challenged signers would impose severe burdens on the Board. In the current election, we are informed, the Board received petitions containing slightly over 36,000 signatures. On the two rejected petitions, it found 1,432 ineligible. Petitioner minimizes the Board's task by pointing to the availability of "digitalization technology, which can display on a computer screen an exact replica of an individual's signature as it appears on his voter registration card." But even computer assisted comparison of petition and registration signatures would require manpower and time, and—beyond the question of cost—could well lead to judgment calls and disputes as to authenticity which the Board understandably seeks to avoid. In sum, to require election officials to do more than compare names against registration lists and other Board records would be to saddle them with tasks and costs that the Constitution does not require them to bear.

■ A statute is rational for constitutional purposes even if it is not the best solution for a problem, so long as the legislature could rationally have believed the statute would achieve a legitimate purpose. *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 242, 104 S.Ct. 2321, 2330, 81 L.Ed.2d 186 (1984); *Western & Southern Life Ins. Co. v. Board of Equalization,* 451 U.S. 648, 671–72, 101 S.Ct. 2070, 2084–85, 68 L.Ed.2d 514 (1981); *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 101 S.Ct. 715, 723, 66 L.Ed.2d 659 (1981). A claim of irrationality cannot succeed if the information available to the legislature, and information which courts may judicially notice, make the issue at least debatable. *Id.* at 464, 101 S.Ct. at 724 (quoting *United States v. Carolene Products Co.,* 304 U.S. 144, 153–54, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938)). The rationality of § 1–1312(*o*)(3) is made clear by an illustration which the Board gives us. At present, 102 persons in the voter registration records have the name Mary Johnson; 73 persons have the name Robert Williams; and 63 have the name Michael Smith. If the addresses of a signatory bearing one of these names does not agree with the Board's records, which one of the Mary Johnsons (for example) would the Board decide to be the correct one? And notifying each such signer within the accelerated time for determining the validity of a challenge—with a request to forward a change of address if applicable—would entail yet another burden which the Constitution does not require.

For the foregoing reasons, application of § 1–1312(*o*)(3) did not infringe the due process or First Amendment rights of either petitioner or the voters who sought to place his name on the ballot. The decision of the Board is, therefore,

*Affirmed.*

---

alternative to being on ballot when election law minimally impedes listing on the ballot); *but see Anderson v. Celebrezze,* 460 U.S. at 799 n. 26,

103 S.Ct. at 1575 n. 26 (permitting write-in candidacies may not be adequate substitute for listing on the ballot).