David BEST, Petitioner,

v.

**DISTRICT OF COLUMBIA BOARD OF ELECTIONS AND ETHICS,**
Respondent.

No. 04–AA–45.

District of Columbia Court of Appeals.

Argued May 25, 2004.

Decided June 4, 2004.

---

David Best, pro se.

Terri D. Stroud, for respondent.

Before FARRELL and GLICKMAN, Associate Judges, and KING, Senior Judge.

GLICKMAN, Associate Judge:

In January of this year, the District of Columbia Statehood Green Party held its Presidential Preference Primary. The purpose of this primary election was to award delegates from the District of Columbia to the national nominating convention of the Green Party of the United States, which is to be held in Milwaukee from June 23 through June 28, 2004. The Statehood Green Party's primary election plan awards delegates to Green Party presidential candidates in proportion to their shares of the total vote rather than on a winner-take-all basis. The issue in this appeal is whether the District of Columbia Board of Elections and Ethics must tabulate write-in votes to determine whether any single write-in nominee received enough votes to qualify for a delegate.

Petitioner David Best, who cast a write-in ballot in the Statehood Green Party primary, requested the Board to count the write-in votes. The Board refused to do so because, based on the vote totals, no write-in nominee could have received more votes in the primary than the plurality winner received. In his *pro se* petition for

review of that decision, Best asks us to reverse the Board and order it to count the write-in votes. He points out that, while no write-in nominee could have received a plurality of the votes, it is possible that a write-in nominee received enough votes to win a delegate.

Since the Green Party's national convention is almost upon us, we have expedited our hearing and decision in this case. We grant the relief that petitioner requests. We hold that the Board of Elections and Ethics must tabulate write-in votes where, as here, it is possible that the count would affect the outcome of the election.

## I.

*The Statehood Green Party's Primary Election Plan*

On July 17, 2003, the Statehood Green Party notified the Board of Elections of its intent to conduct a presidential preference primary and filed its Presidential Primary Election Plan for selecting delegates from the District of Columbia to the Green Party national nominating convention. *See* D.C.Code § 1–1001.05(b)(3)(C) (2001). The Primary Election Plan stated that the Statehood Green Party would "use proportional representation to reflect the primary vote total" at the convention and presented a formula for awarding the District's six allotted delegates [1] according to the percentage of votes that each presidential candidate received. Under the formula, "[a]ny candidate who receive[d] 16.6 percent of the vote or more [would] get at least one delegate," and the delegates would be awarded in increments as follows:

---

1. We have been informed *dehors* the record that the Green Party subsequently increased the District's allotment to eleven delegates. As this numerical increase does not affect our decision, we shall disregard it, though it might alter the precise number of delegates to which a successful write-in candidate may be entitled.

| Percentage of Primary Vote | Number of Delegates |
|---|---|
| 16.6-33.1 percent | 1 |
| 33.2-49.7 percent | 2 |
| 49.8-66.3 percent | 3 |
| 66.4-82.9 percent | 4 |
| 83.0-99.9 percent | 5 |
| 100 percent | 6 |

Recognizing that "[a]fter delegates have been assigned to candidates based on the votes there could be delegates left uncommitted because of candidates who received less than 16.6 percent of the vote," the Plan provided that any uncommitted delegates would be awarded to the candidate with the most votes.

The delegates themselves would be selected by the Statehood Green Party after the primary based on the voting results. As the Plan explained, at the national nominating convention, these delegates would be obliged "to respect the will of DC Statehood Green Party voters" and vote for the top two vote-getters in the primary:

> The Green Party of the United States uses instant-runoff voting to determine its presidential nominee. Therefore, there are no second ballots. Delegates pledged to the candidate with the most votes will list the candidate with the second-highest vote total as their No. 2 choice. Delegates pledged to the candidate who finished second or third, will list the candidate who received the most votes as their No. 2 choice. If there are additional candidates, delegates are free to rank the remaining candidates in the order they believe best.

The Primary Election Plan also specified the procedures for candidates to be listed by name on the ballot. Two members of the Green Party, David Cobb and Sheila Bilyeu, filed the necessary petitions, formal declarations of candidacy, and affidavits of qualifications. *See* D.C.Code § 1–1001.05(b)(2); 3 DCMR § 601 (1998). Cobb and Bilyeu thus became the only candidates listed on the Statehood Green Party ballot.

Cobb and Bilyeu were not the only choices available to Statehood Green Party voters, however. The Primary Election Plan provided that "the ballot will also have space for write-in candidates and a place for voters to choose 'No Candidate.'" *See* D.C.Code § 1–1001.08(r)(1) (Supp. 2003) ("In any primary ... election held in the District of Columbia to nominate ... candidates to public office, a voter may cast a write-in vote for a candidate other than those who have qualified to appear on the ballot."). The Plan did not require prospective write-in candidates to declare themselves publicly before the primary, and no Green Party member did so.[2]

*The Primary Election*

On January 13, 2004, the Board of Elections conducted the 2004 presidential preference primary election for the District of Columbia. For the Statehood Green Party, the Board reported the following final results:

---

**2.** D.C. election law does not require a write-in candidate to make a pre-election declaration of candidacy; though a write-in candidate may request authorization to have poll watchers and count observers on election day by filing a declaration and an affidavit of qualifications at least fourteen days before the election, *see* 3 DCMR § 1406.2, this is not mandatory.

| Candidate | Number of Votes | Percentage of Total |
|---|---|---|
| David Cobb | 142 | 36.79% |
| Write-ins | 123 | 31.87% |
| Sheila Bilyeu | 71 | 18.39% |
| "No Candidate" | 50 | 12.95% |

No write-in candidate declared his or her candidacy within three days after the election. *See* D.C.Code § 1–1001.08(r)(2) ("To be eligible to receive the nomination of a political party for public office, a write-in candidate shall ... declare his or her candidacy not later than 4:45 p.m. on the third day immediately following the date of the election on a form or forms prescribed by the Board.").

Because the total number of write-in votes was less than the plurality that David Cobb received, the Board concluded that there were insufficient votes for any write-in candidate to be the winner of the primary. For that reason, and since no write-in candidate had filed a declaration of candidacy, the Board declined to tabulate the write-in votes by individual recipient. The Board certified the results of the primary and declared Cobb to be the winner. As the Board did not receive a request from a candidate for a recount by the deadline for filing such a request, *see* D.C.Code § 1–1001.11(a)(1), the Board did not conduct a recount.

## II.

In response to a voter's timely request, this court has jurisdiction to review and set aside the results of an election and to order a recount or take other appropriate action so that the "true results" may be declared. *See* D.C.Code § 1–1001.11(b)(2). The purpose of a presidential preference primary election is to allow the voters to "express their preference for candidates ... for nomination for President," *id.* at § 1–1001.05(b)(1) (2001), and our authority extends to correcting any defect in the process "serious enough to vitiate the election as a fair expression of the will" of the

voters. *Id.* at § 1–1001.11(b)(2)(B) (Supp. 2003).

Petitioner Best asks us to direct the Board of Elections to tabulate the write-in votes cast in the Statehood Green Party primary in order to ascertain the voters' true preferences. Best's main argument, and the only one we consider, is that the provisions of D.C. election law require such a tabulation in the circumstances of this case. The Board construes the law differently. It argues that no further count of the write-in votes is necessary, since only two persons declared themselves to be candidates in the primary, and one of them (Cobb) was the clear "winner."

As in the case of other administrative bodies, we recognize that the Board's position deserves our respectful consideration. We owe deference to the Board's interpretation of the law that it administers, "and, especially, of the regulations which it has promulgated ...." *Allen v. District of Columbia Bd. of Elections & Ethics,* 663 A.2d 489, 495 (D.C.1995). Our deference has its limits, however. We will not uphold an interpretation by the Board, even an interpretation of one of its own regulations, if that interpretation is "plainly wrong or inconsistent with the legislative purpose," *id.,* or if the interpretation would yield "an absurd result." *See Pendleton v. District of Columbia Bd. of Elections & Ethics,* 449 A.2d 301, 307 (D.C.1982). In the present case, we think the Board has misapprehended the legislative purpose and consequently embraced an interpretation of its regulations that, in the context of the Statehood Green Party primary election, serves only to thwart the fundamental statutory goal.

As petitioner contends, what is at stake in this case is the right of voters to

have their electoral preferences honored in a primary election structured, permissibly, on principles of proportional representation. "[T]he right to vote is a fundamental constitutional right," *Scolaro v. District of Columbia Bd. of Elections & Ethics*, 691 A.2d 77, 87 (D.C.1997), and that right extends to primary elections. *See United States v. Classic*, 313 U.S. 299, 319, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941). Appreciating the importance of the franchise, we construe our election law "liberally ... so as not to deny innocent voters their right to vote ...." *Curtis v. Bindeman*, 261 A.2d 515, 517 (D.C.1970). "[T]his court is mindful that a prime purpose of Congress in formulating the District of Columbia Elections law was to keep the franchise open to as many people as possible." *Gollin v. District of Columbia Bd. of Elections & Ethics*, 359 A.2d 590, 595 (D.C. 1976). So, for instance, in *Kamins v. Board of Elections for the District of Columbia*, 324 A.2d 187 (D.C.1974), we held that the elections board erred in restrictively interpreting the election law to preclude it from counting write-in votes for presidential candidates for whom a valid slate of electors had been filed. "The fundamental nature of the right involved persuades us," we said, "that construction of the statute in favor of the franchise is the course which we must follow since there is no compelling reason to do otherwise." 324 A.2d at 192.

Obviously not all voting restrictions are improper. We recognize that "[a]s a practical matter, 'there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process.'" *Orange v. District of Columbia Bd. of Elections & Ethics*, 629 A.2d 575, 579 (D.C.1993) (quoting *Storer v.*

*Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974)) (rejecting constitutional challenges and upholding Board's removal of candidate's name from an election ballot because he had failed to file a nominating petition signed by the requisite number of duly registered voters as required by statute). Thus we appreciate the importance of reasonable regulatory provisions that are aimed, for example, at ensuring candidate eligibility, preventing voter confusion and electoral fraud, and the like. ·*See, e.g., Williams v. District of Columbia Bd. of Elections & Ethics*, 804 A.2d 316 (D.C.2002) (upholding Board's decision to reject nominating petitions because of fraud, resulting in denial of a place on the ballot in the primary). Nothing in our opinion today is intended to call such provisions into question. That said, we construe our election law and regulations whenever possible so as to effectuate the basic goal, enshrined in the statute itself, of enabling the voters to "express their preference." D.C.Code § 1–1001.05(b)(1) (2001).

Why, then, does the Board refuse to tabulate the 123 write-in votes cast in this primary election and determine whether a write-in nominee received enough votes to qualify for a delegate? The Board's main contention is simply that its regulations and the statute do not require it to count those votes. The focal point of the Board's disagreement with petitioner Best is a regulation that speaks directly to the counting of write-in votes, 3 DCMR § 810.10. This regulation states that "[t]he total of votes cast for each write-in candidate shall be calculated only in contests where there is no candidate printed on the ballot in order to determine a winner, or where the total number of write-ins reported, under § 810.8,[3] is *sufficient to elect a write-in*

---

**3.** 3 DCMR § 810.8 states, inappositely, that "[t]he total of votes cast for each candidate whose name appears pre-printed on the ballot

shall be calculated by precinct and city-wide." We surmise that the intended reference is 3

*candidate.*" (Emphasis added.) The Board understands the italicized language to mean that it must be possible that a write-in candidate received the highest number of votes in the election—a plurality if not the majority of the votes cast.[4] In support of this reading, the Board cites D.C.Code § 1–1001.10(b)(1), which states in pertinent part that when the results of an election are tallied, "[c]andidates who receive the highest number of votes ... shall be declared winners." As the Board conceives of it, an election can have only one "winner."

■ The problem with the Board's "single-winner" conception, as petitioner Best contends, is that it is ill-adapted to the context of a primary election in which the candidates win delegates in proportion to their votes. In such an election, the single candidate who receives the highest number of votes may not be entitled to win all the delegates; hence there may be multiple winners. Where that is the electoral design, the Board's single-winner conception of its duties is not calculated to elicit the "true results" of the election but instead "vitiate[s] the election as a fair expression of the will" of the voters. D.C.Code § 1–1001.11(b)(2) (Supp.2003).

That perverse impact is manifest in this case. The Statehood Green Party undertook to allow its voters to express their preferences to a maximal extent when it adopted proportional representation instead of winner-take-all as its method of delegate selection. Proportional representation is designed to reflect more closely the actual views of a divided electorate. The Board's refusal to tabulate the write-in ballots jeopardizes the Party's intentions and the goal of an accurate expression of the voters' will. Indeed, the Board's decision could affect the outcome of the primary election and, indirectly, the national convention. That possibility exists because, with write-in ballots accounting for thirty-two percent of the vote, a single write-in nominee may have received more than enough votes—16.6% of the total, under the Party's Primary Election Plan—to qualify for a delegate to the national convention. With no successful write-in candidate to claim that delegate, David Cobb is entitled to five of the six delegates allotted to the District of Columbia—two delegates based on his share of the vote plus three delegates who are considered "uncommitted"—and Sheila Bilyeu is entitled to the remaining delegate. A successful write-in candidate, if one is recognized, would be entitled to one of the otherwise "uncommitted" delegates. That would leave Cobb with four delegates. If the write-in candidate received more votes than Bilyeu did, moreover, he or she rather than Bilyeu would be entitled to the second-choice votes of Cobb's four delegates at the national convention.

"[T]he Board, as well as this court, has a responsibility to determine the true results of the election, i.e., the true intent of the voter[s] ...." *Leckie v. District of Columbia Bd. of Elections & Ethics,* 457 A.2d 388, 389–90 (D.C.1983) (internal citations omitted). We cannot agree to an interpretation of election law and regulations by the Board that would thwart the fundamental purpose of the law, arbitrarily nullify the legitimate electoral choices of voters who cast write-in ballots, and skew the outcome of the vote. In our view the Board has misapprehended D.C.Code § 1–1001.10(b)(1) (2001) and adopted an unnec-

---

DCMR § 810.9, which reads: "The total number of write-in votes punched by voters shall be reported for each contest."

4. Thus, as the Board expressly acknowledges, it would have tabulated the votes cast for each write-in nominee if the total number of write-in votes had exceeded the number of votes (142) that Cobb received.

essarily restrictive interpretation of 3 DCMR § 810.10. The statute does not preclude recognition of multiple "winners" where that is what the election plan is intended to permit. If an election is designed to reward the top three finishers with delegates, for example, then we see no reason why there cannot be three "[c]andidates who receive the highest number of votes ... [and who] shall be declared winners." D.C.Code § 1–1001.10(b)(1). In short, to achieve its purpose, the statute can and should be interpreted so that it fits the type of election to which it is applied.

The same is true, in our view, of the regulation. In the context of a primary election held to award delegates to candidates in proportion to their votes, 3 DCMR § 810.10 must be read to require the Board to count the votes for each write-in candidate so long as the total number of write-in votes is "sufficient to elect a write-in candidate" *to be represented by a delegate.* The purpose of the election is determinative.

Finally, the fact that no write-in candidate filed a declaration of candidacy did not excuse the Board from counting the votes received by each write-in nominee. As previously mentioned, a declaration of candidacy is not required prior to the election; rather, the statute affords a write-in candidate three days after the election to file and become eligible. *See* D.C.Code § 1–1001.08(r)(2) (Supp.2003). To accommodate such candidacies, Board regulations specifically provide that if "the apparent winner" of the election is "a write-in candidate who has not previously filed a Declaration of Candidacy and Affidavit of Qualifications with the Board, that individual shall immediately be notified by hand delivery or by mail of the results of the election." 3 DCMR § 604.2. The regulations go on to provide that "[i]n the case of a primary election, a write-in nominee, who is an apparent winner and wishes to perfect his or her candidacy shall file with the Board an Affirmation of Write-in Candidacy,[5] on a form provided by the Board, not later than twenty-four hours (24 hrs.) following receipt of notice of the election results." 3 DCMR § 604.3. A write-in nominee who is an "apparent winner" in the primary—that is, in our view, one who apparently is entitled to delegate representation at the national convention—thus must be notified and given an opportunity to submit the required documentation in the prescribed time before he or she "shall be deemed to be ineligible ... and votes cast for such individuals shall be deemed invalid." 3 DCMR § 604.5.

As we see it, therefore, the Board should have tabulated the write-in votes in the Statehood Green Party primary to ascertain if any write-in nominee was an "apparent winner" of a delegate; if so, the Board then should have furnished that nominee the requisite opportunity to perfect his or her candidacy. Pursuant to our review authority over the election, we direct the Board to proceed forthwith to count the votes cast for each write-in nominee and, if it appears that any write-in nominee received enough votes to qualify for the award of a delegate to the Green Party national convention, to undertake the further steps required.

*So ordered.*

---

**5.** The Affirmation of Write-in Candidacy contains the same information as the Declaration of Candidacy. *See* 3 DCMR § 604.6.